§
§
§
§
§
§
§
§
§
§
§
§
§

Exhibit A

```
CCALBEY1                        Trial
```

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  OBA HASSAN WAT BEY, et al.,
 4              Plaintiffs,
 5         v.                              99 CV 3873 (AJN)
                                           01 CV 9406 (AJN)
 6  THE CITY OF NEW YORK, et al.,
 7              Defendants.
 8  ------------------------------x
                                           New York, N.Y.
 9                                         December 10, 2012
                                           9:18 a.m.
10  Before:
11
                    HON. ALISON J. NATHAN,
12
                                           District Judge
13
                           APPEARANCES
14
    THOMAS & ASSOCIATES
15       Attorneys for Plaintiffs
    BY:  IRENE DONNA THOMAS
16       -and-
         DAVID SCHLACHTER
17
    NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF THE CORPORATION COUNSEL
         Attorneys for Defendants
19  BY:  MAXWELL D. LEIGHTON
         RICARDO TAPIA
20       JAMES M. LEMONEDES
21
22
23
24
25

CCALBEY3                    Blake - recross

1    exemptions they claim.  Respondents' beliefs, as sincere as
2    they may be, do not present colorable legal claims."
3            MR. TAPIA:  Thank you.  I have no further questions.
4            THE COURT:  All right.  Ms. Blake, you may step down.
5    Thank you.
6            (Witness excused)
7            THE COURT:  Who's the next witness, please?
8            MS. THOMAS:  Terrence Skinner.
9            THE COURT:  Please bring in Mr. Skinner.
10           Is someone getting Mr. Skinner?
11           MS. THOMAS:  Yes.
12           THE COURT:  Good afternoon, Mr. Skinner.  Come on up,
13   please.
14    TERRENCE SKINNER,
15        called as a witness by the Plaintiffs,
16        having been duly sworn, testified as follows:
17   DIRECT EXAMINATION
18   BY MS. THOMAS:
19   Q.  Good morning, Mr. Skinner.
20           Are you currently employed?
21   A.  No, I'm not.
22   Q.  Between 1997 and 1998, where were you employed?
23   A.  The New York City Department of Correction.
24   Q.  And how long had you -- were you employed by the New York
25   City Department of Correction?

CCALBEY3                Skinner - direct

1   A.  At that time, 14 years.
2   Q.  And what was your job title at that time during that
3   period?
4   A.  I was a deputy warden, the executive officer to the chief
5   of security.
6   Q.  And who was your immediate superior?
7   A.  Chief William Fraser.
8   Q.  And what was his job title, he was chief of the department?
9   A.  He was chief of security.
10  Q.  Now, who was Commissioner of the New York City Department
11  of Corrections at that time?
12  A.  Bernard Kerik.
13  Q.  And the mayor?
14  A.  Rudolph Giuliani.
15  Q.  Now, what were your job duties as executive officer to the
16  chief of security?
17  A.  Responsibilities included managing overall security
18  throughout the entire department.
19  Q.  And did you have any responsibilities in connection with
20  the gang intelligence unit?
21  A.  Yes.  The chief of security's office oversaw the gang
22  intelligence unit.
23  Q.  And did you have particular responsibilities in connection
24  with that unit?
25  A.  I had previously been the commanding officer of the gang

CCALBEY3                    Skinner - direct

1    intelligence unit.
2    Q.  Who was responsible for establishing the unit?
3    A.  It was Chief Taylor.  Initially, the unit was the gang task
4    force.  I was asked to conduct an analysis of how it operated
5    and what it did.  I did that, and then I was placed in charge
6    of the new gang intelligence unit.
7    Q.  Now, was the gang intelligent unit ever used for a purpose
8    other than its original intent?
9    A.  One time, at some point in 1998 between August and December
10   of 1998.
11   Q.  And what happened at that time?
12   A.  We were instructed by the Inspector General, Mike Caruso,
13   to have the gang intelligence unit conduct video surveillance
14   of a protest at 60 Hudson Street.
15   Q.  And was there a meeting held to plan the surveillance?
16   A.  Initially there was a meeting between myself, Chief Fraser,
17   Commissioner Kerik, and his chief of staff, John Piciano.  And
18   at that meeting we were instructed that Mike Caruso would
19   contact us and that we should do what he needed us to do
20   regarding our surveillance of the demonstration that was going
21   to take place.
22   Q.  And what was the concern that was raised at that meeting
23   concerning the surveillance activity?
24   A.  The commissioner indicated that the mayor had held a press
25   conference and indicated that these people were going to be

CCALBEY3                    Skinner - direct

1  fired for the actions that they had taken and that this was an
2  important issue, so we should do what was necessary to assist
3  the Inspector General's Office in trying to gather information
4  against this group.
5  Q.  And what group were you referring to, sir?
6  A.  They were referred to as the Moors.
7  Q.  Now, did you actually conduct surveillance at the 60 Hudson
8  Street location?
9  A.  The gang intelligence unit did do video surveillance of the
10 demonstration, yes.
11 Q.  Were you present during that surveillance?
12 A.  I wasn't with them, but I was present at 60 Hudson Street,
13 out on the street, observing the protest.
14 Q.  At any time did the gang intelligence unit remove
15 individuals from the 60 Hudson Street location?
16 A.  No.  It was the security for the actual demonstration was
17 done by the NYPD.  The gang intelligence unit was in an
18 undercover vehicle and they did the surveillance.  And it was
19 peaceful, there were no issues, and basically that was the end
20 of the surveillance.
21         MS. THOMAS:  Thank you very much.  No further
22 questions save any redirect.
23         THE COURT:  Anything, Mr. Schlachter?
24         MR. SCHLACHTER:  No questions, your Honor.
25         THE COURT:  Who will be examining?

CCALBEY3                     Skinner - direct

          MR. TAPIA:  Yes, your Honor, I have a few questions.

          THE COURT:  Mr. Tapia.

CROSS-EXAMINATION

BY MR. TAPIA:

Q. Good morning, Mr. Skinner.

A. Good morning.

Q. Did you have a lawsuit where you sued the City of New York and the Department of Corrections previously?

A. Yes, I did.

Q. And that lawsuit was resolved?

A. Yes, it was.

Q. Now, have you spoken to Ms. Thomas, Irene Donna Thomas, in the past?

A. Yes, I have.

Q. Have you ever spoken to me in the past?

A. Not that I know of.

Q. And what about Mr. Maxwell Leighton, have you spoken to him?

A. He looks familiar but I don't think so.

Q. As far as any of the tax records that were submitted by the plaintiffs in this case, have you seen any of those documents?

A. I have not.

Q. Have you read any of the decisions issued by the administrative law judge in these cases?

A. No, I have not.

CCALBEY3                    Skinner - cross

1   Q. And as far as the demonstrations that were held that day,
2   were they stopped at all in any way?
3   A. No. It was just one demonstration.
4           MR. TAPIA: I have nothing further. Thank you.
5           THE COURT: Ms. Thomas.
6   REDIRECT EXAMINATION
7   BY MS. THOMAS:
8   Q. Mr. Skinner, without going into the specifics of your
9   lawsuit, what was its resolution?
10  A. The case was decided in my favor.
11          MR. TAPIA: Objection, your Honor.
12          THE COURT: Overruled. Go ahead.
13  A. The case was decided in my favor, a jury trial.
14  Q. And were you satisfied with that?
15  A. Yes, I was.
16          MS. THOMAS: No further questions, your Honor.
17  RECROSS EXAMINATION
18  BY MR. TAPIA:
19  Q. Now, did your case have anything to do with the Moorish
20  American faith?
21  A. No, it did not.
22  Q. Did it have anything to do with these seven individuals in
23  this courtroom?
24  A. No, it did not.
25  Q. By the seven individuals, obviously, I mean the plaintiffs.

CCALBEY3                    Skinner - recross

A.   No.

Q.   Okay.  And as far as the verdict in your favor, you actually settled the case after the verdict, correct?

A.   The city appealed and then there was a settlement, yes.

          MR. TAPIA:  Thank you so much.

          THE COURT:  You may step down.  Thank you.

          THE WITNESS:  Leave?

          THE COURT:  Yes, you may.

          (Witness excused)

          THE COURT:  Ms. Thomas, who will be the next witness?

          MS. THOMAS:  Mr. Andrew Fenneck.  Is he here?

          MR. LEIGHTON:  Give me 30 seconds.  I have to see which witness is present.

          THE COURT:  I invite you to stand in place and stretch if you like.

          MR. LEIGHTON:  Your Honor, I believe both witnesses or the next witness is on the 8th floor.  We moved a little more quickly than I expected.  They are present; I know they're there.  It's your discretion if you wish for me to get them and bring them up.

          THE COURT:  I do.  I'll let the jury take a break rather than sitting here.  You can go back to the room for about five minutes.

          (Continued on next page)



§
§
§
§
§
§
§
§
§
§
§
§

# Exhibit B

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/5/13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
OBA HASSAN WAT BEY, et al.,

                             Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,
                             Defendants.
------------------------------------------------------------X

99 **CIVIL** 3873 (AJN)
01 **CIVIL** 9406 (AJN)
**AMENDED JUDGMENT**

#12,2265

Following a trial held from December 4 through December 13, 2012, a jury having rendered a verdict finding in favor of Plaintiffs and against Defendants City of New York ("the City"), William Fraser ("Fraser"), and Bernard Kerik ("Kerik") (collectively, "Defendants"); thereafter, post-trial motions were filed by the parties in the above-captioned employment discrimination action; on September 4, 2013, this Court having rendered a Memorandum and Order granting Defendants' motion to vacate the award of punitive damages, but denying the remainder of Defendants' motion, granting Plaintiffs' motions for pre-and post-judgment interest, but denying the remainder of Plaintiffs' Rule 59 and 60 motions, granting Plaintiffs' motions for attorney's fees and costs in part, awarding Ms. Thomas $1,271,573.96 in fees and costs, awarding Mr. Schlachter $175,253.50 in fees and costs, and directing the Clerk of the Court to correct the judgment previously entered, Dkt. No. 396, to reflect this Order, and the matter having come before the Honorable Alison J. Nathan, United States District Judge, and the Court, on October 22, 2013, having rendered its Order granting Plaintiffs' request for calculation of prejudgment interest, and directing the Clerk of the Court to calculate prejudgment interest according to the methodology described in Section IV.B of the Court's Memorandum and Order dated September 4, 2013, see Dkt. No. 501, at 60-61, and using the dates given in Plaintiffs' letter dated October 22, 2013, Dkt. No.

529, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum and Order dated September 4, 2013 and Order dated October 22, 2013, Defendants' motion to vacate the award of punitive damages is granted, but the remainder of Defendants' motion is denied; judgment is entered as follows: in favor of plaintiff Robert Watson in the amount of $488,000 plus pre-judgment interest of $106,071.41 for a total of $675,404.75; in favor of plaintiff Pedro Rivera Sr. Bey in the amount of $467,000 plus pre-judgment interest of $87,005.89 for a total of $554,005.89; in favor of plaintiff Alberto Rivera Bey in the amount of $405,000 plus pre-judgment interest of $40,994.00 for a total of $445,994.00; in favor of plaintiff Hassan Abdallah in the amount of $467,000 plus pre-judgment interest of $87,005.89 for a total of $554,005.89; in favor of plaintiff Edward Ebanks in the amount of $300,000 plus pre-judgment interest of $55,892.44 for a total of $355,892.44; in favor of plaintiff Michael Nichols in the amount of $379,000 plus pre-judgment interest of $70,610.77 for a total of $449,610.77; in favor of plaintiff Herbert Hinnant in the amount of $300,000 plus pre-judgment interest of $55,892.44 for a total of $355,892.44; all as against defendant City of New York; Plaintiffs' motions for pre-and post-judgment interest are granted, but the remainder of Plaintiffs' Rule 59 and 60 motions are denied; Finally, Plaintiffs' motions for attorney's fees and costs are granted in part; Ms. Thomas is awarded $1,271,573.96 in fees and costs, and Mr. Schlachter is awarded $175,253.50 in fees and costs.

**DATED:** New York, New York
November 5, 2013

**RUBY J. KRAJICK**

Clerk of Court

BY: _____
Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

§
§
§
§
§
§
§
§
§
§
§
§

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

YASHUA AMEN SHEKHEM'EL-BEY,

              Plaintiff,

   - against -

CITY OF NEW YORK, ET AL.,

              Defendants.

------------------------------------x

05 Civ. 7270 (TPG)

**ORDER**

Pursuant to plaintiff's request in letters dated November 21, 2005 and April 13, 2006, this case is dismissed without prejudice.

SO ORDERED.

Dated:    New York, New York
           April 19, 2006

                                              THOMAS P. GRIESA
                                              U.S.D.J

MICROFILM  APR 21 2006  -9:00 AM