USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/19/13

PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- )
Yashua Amen Shekhem El Bey,                                     )      Verified Civil Complaint
                                                               )      Civil Docket: **13 CV 8927**
                                    Plaintiff,                  )
v.                                                             )
                                                               )
The City of New York; Rudolph Giuliani,                        )
individually and as former Mayor and Chief                    )
Executive Officer of the City of New York; Bernard            )      AMENDED COMPLAINT
Kerik, individually and as former Commissioner of             )
the Department of Correction of the City of New               )
York (DOC); William Fraser, individually and as              )      Civil Complaint for Damages and
former Chief of the Department of the City of New            )      Declaratory Relief Based On Newly
York Department of Correction (DOC); Michael                  )      Discovered Information and Evidence
Caruso, individually and as former Inspector General         )
of the City of New York Department of Investigation          )      **JURY TRAIL DEMANDED**
(DOI);                                                        )      **HEREIN**
                                    Defendants,               )
--------------------------------------------------------------- )

1.      COMES NOW Plaintiff, Yashua Amen Shekhem El Bey, proceeding Pro Se in this

action, complains of municipal Defendants and alleges as follows:

### STATEMENT OF THE CASE

2.      This is a civil action for equitable and ancillary relief arising out of newly discovered

information and evidence which revealed fraud, conspiracy and retaliation learned for the first

time in the Oba Hassan Wat Bey, et. al. v. The CITY OF NEW YORK, et. al. 99 Civ. 3873

(AJN) (RLE) & 01 Civ. 9406 (AJN) (RLE) case following the course of it's jury trial proceeding

that ended in a unanimous jury verdict in favor of the Plaintiffs in that case on December 18,

2012 to whom Plaintiff in this action is similarly situated, as the underlining factual

circumstances are the same and/or related with essentially the same Defendants with respect to

this action and Plaintiff's prior civil cases filed in this court and seeking the same or similar

relief, but not limited thereto.

RECEIVED
DEC 19 2013
PRO SE OFFICE

3.      Plaintiff seeks punitive and compensatory damages against Defendants, and each of them for committing acts under color of state law, in conspiracy, retaliation and fraud thereof, which deprived Plaintiff of fundamental human rights and rights secured under the Constitution and laws of the United States of America and the New York State Constitution.

4.      Defendants intended, and for the purpose, to deprive Plaintiff's rights to equal protection under the law, rights to freedom of association, rights to due process of the law, rights to freedom of speech, and other rights and liberties, including rights pursuant to the New York State Constitution and for refusing or neglecting to prevent those deprivations and denials, causing Plaintiff damages as will be more fully specified below:

## JURISDICTIONAL STATEMENT

5.      Plaintiff's authority for this "independent action" arises from  FRCP 60 (d)(1) and (3): FRCP 60 (d)(3).

6.      This Court has jurisdiction of this action pursuant Article 3 of the U.S. Constitution and 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 1985 (3), 42 U.S.C. § 1986; 42 U.S.C. § 1981 and 42 U.S.C. § 1983; Including the 1st and 5th Amendment through the 14th Amendment U.S. Constitution. as applicable to the States, including the "equal protection" clause therein.

7.      Jurisdiction is conferred under 28 U.S.C. §§ 453, 454 and 455.

8.      Jurisdiction is proper pursuant to the Declaratory Judgment Act. 28 U.S.C. § 2201 and for further relief per 28 U.S.C. § 2202 based on a declaratory judgment, to include FRCP 57.

9.      Jurisdiction is also proper under Article 6 of the U.S. Constitution and in conjunction with the United Nations General Assembly, December 10, 1948 - Signed and Adopted by the United States of America, the United Nations Universal Declaration of Human Rights, Article 3,

6, 7, 8, 10, **15**, 17 (2), 18, 19, 20 (1), 21 (2), and 28; all applicable to Plaintiff's fundamental Human Rights.

10.    The All Writs Act, 28 U.S.C. § 1651 in aid of this Courts Jurisdiction.

11.    This Court has supplemental pendant state jurisdiction over Plaintiff's state law claims arising out of Plaintiff's timely filed Notice of Claim to the City of New York pursuant to 28 U.S.C. § 1367 with respect to newly discovered information and evidence on the record of the aforesaid Oba Hassan Wat Bey, et. al. v. The City of New York, el. al. Case (cite omitted).

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES
## PLAINTIFF

13.    Plaintiff, Yashua Amen Shekhem El Bey, (p/k/a James D. Mercer)(herein after referred to as Plaintiff) is a Moor or Moorish American.

14.    Plaintiff is a Citizen of the United States of America and Citizen of New York State.

15.    Plaintiff is a former employee of the New York City Department of Correction.

16.    Plaintiff was hired by defendant City of New York as a Corrections Officer on June 13, 1983.

17.    Plaintiff is domiciled in New York State within New York City, whose mailing address is 244 Fifth Avenue, Suite 200, New York, New York 10001.

18.    Plaintiff was and at all time relevant to this matter a tenured, permanent, competitive class civil service employee with a property interest in his employment.

19.    During Plaintiff's employment tenure, his job performance has been at least satisfactory.

## DEFENDANTS

20.    Defendant City of New York (herein after City) is a municipal corporation, local governmental unit and is chartered under the laws and constitution of the State of New York and is a recipient of federal funds.

21.    The Defendant City's address is City Hall, New York, New York 10038.

22.    Defendant City is, and at all time relevant hereto, was and/or is an "employee" within the meaning of the New York City and New York State Human Rights Laws.

23.    The Defendant City is at all time relevant hereto, a "person" within the meaning of 42 U.S.C. § 1983.

24.    Defendant Rudolph Giuliani (herein after Giuliani) was, and at all times relevant to this matter, the former Mayor of the City of New York and the Chief Executive Officer and is or was a "person" within the meaning of 42 U.S.C. § 1983

25.    Defendant Giuliani is being sued in his official and/or individual capacity. Giuliani's last known principle place of business is or was City Hall, New York, New York 10038

26.    Defendant Bernard B. Kerik (herein after Kerik) was, and at all times relevant to this matter,  was the Commissioner of the City Department of Correction (DOC) and is a "person" within  the meaning of 42 U.S.C. § 1983.

27.     Defendant Kerik is being sued in his official and/or individual capacity. Kerik's last known principle place of business is or was 60 Hudson Street, New York, New York 10013.

28.    Defendant William Fraser (hereinafter Fraser) was, and at all times relevant to this matter, the Chief of the Department of the City Department of Correction (DOC) and is a "person within the meaning of 42 U.S.C. § 1983. Defendant Fraser is being sued in his official

and/or individual capacity. Fraser last known principle place of business is or was 60 Hudson Street, New York, New York 10013

29.     Defendant Michael Caruso (herein after Caruso) was, at all times relevant hereto, the Inspector General of the New York City Department of Investigation ("DOI") with responsibility for the City Department of Corrections and is a "person" within the meaning of 42 U.S.C. § 1983.

30.     Defendant Caruso is being sued in his official and/or individual capacity. Caruso's last known principle place of business is or was 60 Hudson Street, New York, New York 10013.

31.     Plaintiff sues the Defendants who are natural persons in both their individual and official capacities.

32.     In doing the acts alleged in this complaint, Defendants acted as agents for and on behalf of all other Defendants named in this complaint.

### CONDITIONS PRECEDENT

33.     On February 28, 2013 Plaintiff submitted a timely Notice of Claim via United States Postal Mail to the Office of the Comptroller of the City based on new information and evidence not previously known to Plaintiff.

34.     Plaintiff learned of the new information and evidence following the course of the jury trail proceeding in the Oba Hassan Wat Bey, et. al. v. The City of New York, et. al. case 99 Civ. 3873 (AJN) (RLE) & 01 Civ. 9406 (AJN) (RLE), which concluded in a unanimous jury verdict favorable to the Plaintiffs on December 18, 2012.

35.     Plaintiff is similarly situated in all respects, as the underlining factual circumstances are the same with essentially the same Defendants.

36.     The Testimony of Terence Skinner in the Oba Hassan Wat Bey Case is what gave rise to this claim as more fully set forth herein. See annexed herein the copy of the Transcript of Terrence Skinner's testimony, dated December 10, 2012 at Exhibit A.

37.     The Honorable Alison J. Nathan, U.S. District Court Judge was the presiding Judge in the Oba Hassan Wat Bey case (cite omitted) and her final amended judgment, the initial one of which is on appeal, was issued on November 5, 2013. see annexed herein a copy of Hon. Judge Alison J. Nathan's Amended Judgment, dated November. 5, 2013 at Exhibit B.

## FACTUAL ALLEGATIONS

38.     On December 18, 2012 a unanimous jury verdict was handed down in the Oba Hassan Wat Bey, et. al. vs. The City of New York, et. al (cite omitted) case of this Court in favor of the Moorish American Plaintiffs who are or were Moorish American former Corrections Officers against the Defendant City, Caruso and Kerik for among other things, discrimination, equal protection violation and denial of due process because of Plaintiffs being a Moor or  Moorish American and for their Moorish American faith.

39.     At all time relevant hereto, Plaintiff herein is similarly situated with the Plaintiffs in the Oba Hassan Wat Bey, et. al. v. The City of New York, et. al (cite omitted) case with respect to this action and Plaintiff's prior civil actions that were filed in this court.

40.     The Plaintiff's prior civil actions related to the Oba Hassan Wat Bey case (cite omitted) are Jawan Akil Bey, et. al. v. City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) (dismissed/stipulation of dismissal); Shekhem El Bey. vs. City of New York, et. al. 00 Civ. 9260 (JES) (dismissed); and Shekhem El Bey, vs. City of New York, et. al. 05 Civ. 7072 (TPG) wherein the Honorable Thomas P. Griesa granted Plaintiff's request for withdrawal without

prejudice to permit Plaintiff to re-file at a latter date. See annexed herein a copy of Hon. Thomas P. Griesa's Order dated April 19, 2006 at Exhibit C.

41.    At all time relevant hereto, Plaintiff's re-filed civil action, filed under informa pauparis on November 13, 2006 subsequently went missing at the Pro Se's Office when Plaintiff, while waiting to receive a civil docket number, the pro se office staff was unable to locate the complaint. Said complaint never received a civil complaint number.

42.    On or about August 2008, by United States postal mail, Plaintiff received from the City a Memorandum of law in opposition to plaintiff's 60 (B) Motion.

43.    At all time relevant hereto, Plaintiff never prepared, filed or submitted any 60 (B) motion to the City.

44.    At all time relevant hereto, Plaintiff discovered that Plaintiff's re-filed civil complaint that went missing at the pro se office at 500 pearl street was found under document #44 under the already closed case - Shekhem El Bey. vs. City of New York, et. al. 00 Civ. 9260 (JES) (dismissed). The documents therein is the civil complaint with the statement of relatedness letter and no 60 (B) motion present.

45.    At all time relevant hereto, document #44 is not viewable online or on the intranet system at the U.S. District Court for the Southern District of New York, but can only be viewed in Person at the Court or upon request.

46.    At all time relevant, the City through its agent or its Attorneys committed mail fraud and fraud upon the Court when it mailed to the Plaintiff an opposition motion  when Plaintiff had not submitted any motion to be opposed in which case the opposition motion filed by the City was filed on the Court record and is public record.

47.    Ms. Irene Donna Thomas (herein after Ms. Thomas), of the Thomas Plaintiff's in the Oba Hassan Wat Bey case as distinguished from Plaintiffs represented by David M. Schlachter (Schlachter Plaintiffs), deposed on direct examination a former high ranking DOC official, Terence J. Skinner (herein after Skinner) (non-party-witness), who provided uncontested testimony on December 10, 2012. See copy - Skinner's Transcript annexed herein at Exhibit A.

48.    Skinner (non-party witness) testified that he was a deputy warden, the Executive Officer to the Chief of Security.

49.    Skinner (non-party witness) testified that Defendant Fraser was his immediate superior and that Defendant Fraser was the Chief of the Department and Chief of Security.

50.    Skinner, testified that his "Responsibilities included overall security through out  the entire department".

51.    In response to Ms. Thomas question "...did you have any responsibilities in connection with the gang intelligence unit?" Skinner testified "Yes. The chief of security's office oversaw the gang intelligence unit".

52.    Skinner, testified that he was in charge of the Gang Intelligence Unit for DOC.

53.    In response to Ms. Thomas question "...was the Gang Intelligence Unit ever used for a purpose other than its original intent?" In reply, Skinner testified that "One time, at some point in 1998 between August and December of 1998".

54.    In response to Ms. Thomas question "and what happen at that time?" In reply, Skinner, testified "We were instructed by the Inspector General, Mike Caruso, to have the gang intelligence unit conduct video surveillance of a protest at 60 Hudson Street".

55.    In response to Ms. Thomas question "And was there a meeting held to plan the surveillance?" In reply, Skinner, testified "Initially there was a meeting between myself, Chief

Fraser, Commissioner Kerik, and his chief of staff, John Piciano. And at that meeting we were instructed that Mike Caruso would contact us and that we should do what he needed us to do regarding our surveillance of the demonstration that was going to take place".

56.     In response to Ms. Thomas question "And what was the concern that was raised at that meeting concerning the surveillance activity?" In reply, Skinner, testified "The Commissioner indicated that the mayor had held a press conference and indicated that **these people were going to be fired for the actions that they had taken** and that this was an important issue, so we should do what was necessary to assist the Inspector General's Office in trying to gather information against this group".

57.     In response to Ms. Thomas question "And what group were you referring to, Sir?" In reply, Skinner, testified "**They were referred to as the Moors**".

58.     Skinner, testified that "the Gang Intelligence Unit did do video surveillance of the demonstration...".

59.     Plaintiff herein was not present on the day that Skinner gave testimony and only learned of his testimony through Ntchwaidumela Bey (non-party witness) who attended most or all of the trail hearing and deliberations of the Oba Hassan Wat Bey trail proceedings, and the transcripts of the proceedings was made available and became record on the court 2 to 3 months later, on or about March or April 2013 through which Plaintiff was able to confirm the conspiracy, fraud and retaliation.

60.     At all time relevant hereto, the testimony of  Mr. Terrence Skinner revealed that in 1998 Defendant Kerik held a DOC meeting in which Kerik communicated that "those people are going to be fired".

61.     At all time relevant hereto, according to Skinner's testimony, Defendant Kerik was referring to Moors within the Department of Correction and that there was a press conference held by Giuliani regarding Moors to which evidence was produced at trial by Ms. Irene Donna Thomas, Attorney for the Plaintiffs in the Oba Hassan Wat Bey case.

62.     According to Skinner's testimony, Defendant Kerik also communicated that Defendant Caruso will contact everyone who was at the DOC meeting to coordinate surveillance efforts on the Moors in regards to a planned demonstration at 60 Hudson Street.

63.     Plaintiff was not privy to such information or evidence made available to Plaintiff during Plaintiff's prior civil actions that commenced as far back as 1998 and was not aware of any covert operation targeting Moorish American Correction Officers for discharge or termination of employment that was carried out by Defendant Kerik and Caruso, as this covert operation was carried out in secret and under fraud and is a fraud upon the Court.

64.     At all time relevant hereto, Defendant Giuliani, Kerik, Caruso and Rose Luttan Rubin (non-party in this action), were named Defendants in Plaintiff's prior lawsuit in Jawan Akil Bey, et. al. v. City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) that was filed February 24, 1998 approximately 6 or 7 months before the closed door meeting that was had with Defendant Kerik and Defendant Fraser, along with Picciano (non-party) and Skinner (non-party witness).

65.     At all time relevant hereto, Defendant Giuliani and Caruso were named Defendants in another prior action in which Plaintiff was not a party, however, the actions were by Moorish American Correction officers in Jawan Akil Bey, et. al. v. State of New York, et. al. 97 Civ. 9057 (LAK) that was filed December 9, 1997, approximately 7 or 8 months before the closed door meeting that was had with Defendant Kerik and Defendant Fraser, along with Picciano (non-party) and Skinner (non-party witness).

66.    At all time relevant hereto, Defendant Kerik, Fraser and Caruso actions and conduct relative to the DOC meeting held behind closed doors on or about August and December of 1998 in connection with the Giuliani Press Conference regarding the "Moors" and with the "meeting of the minds", was in part or in whole, a conspiracy for the purpose and intent of discharging Moors or Moorish Americans from DOC employment for filing civil complaints and/or submission of Moorish American documents adopting the Moorish American faith.

67.    At all time relevant hereto, the conspiracy was for the purpose of depriving Plaintiff of the equal protection of the laws because of being Moorish American and/or Moorish faith.

68.    At all time relevant hereto, the conspiracy was for the purpose of depriving Plaintiff of the equal protection of the laws because of having filed a civil action against Giuliani, Kerik and Caruso.

69.    At all time relevant hereto, Defendant Kerik did in fact discharged Plaintiff, as did the Plaintiffs in the Oba Hassan Wat Bey case assuring the statement made behind closed doors that **"these people were going to be fired for the actions that they had taken"** .

70.    At all time relevant hereto, Defendants in furtherance of their conspiracy subjected Plaintiff to a summary suspension in excess of 30 days, modified duty in an asbestos contaminated facility, an administrative tribunal that was subjected to inappropriate influence from Giuliani and Defendant Caruso, and subsequently discharged Plaintiff from employment, as were the Plaintiffs in the Oba Hassan Wat Bey case, neither of whom received any due process of law.

71.    At all time relevant hereto, all evidence provided in the Oba Hasan Wat Bey case has relevance to Plaintiff's claim in this action, as it arises out of the same and/or similar factual circumstances and is essentially with the same Defendants.

72.     Plaintiff, who is Moorish American, a Moor and former New York City Correction Officer, Shield # 6103, is similarly situated as those Moorish American former Correction Officers in the Oba Hassan Wat Bey Case, who as the record and evidence showed in the Oba Hassan Wat Bey case, were singled to be discharged from employment because of being a Moor or Moorish American and/or in retaliation for having filed civil lawsuits against them.

73.     At all time relevant hereto, Defendants Giuliani, Kerik, Caruso and Fraser had and/or has an invidious discriminatory animus against Plaintiff because of being Moorish American or of the Moorish American faith or in association with the Moorish American faith.

74.     At all time relevant hereto, Plaintiff, as a proximate result, suffered injury to his property interest in employment and deprived of his rights as a Citizen of the United States of America.

75.     At all time relevant hereto, according to Mr. Skinner's testimony, present at the meeting beside himself was Defendant Kerik, Fraser and John Piciano (non-party).

76.     During all times relevant herein, defendant Caruso was responsible for investigating charges of misconduct by DOC employees.

77.     Rule 3.20.03 of the Departmental Rules and Regulations provide that DOC employees who make false official statements and who are convicted in a court of criminal jurisdiction have engaged in conduct of comparable seriousness.

78.     Rule 3.20.03 applies to all DOC employees.

79.     The rule prohibiting submission of false tax documents to the DOC applies to all DOC employees.

80.     All DOC employees are subject to the same standards of conduct and evaluation.

81.     For discipline purposes, it is irrelevant if DOC employees who submitted false tax documents to the Department filed all tax returns and paid all taxes.

82.     All DOC employees were investigated under the same "99 exemption" tax investigation.

83.     Defendant Caruso is responsible for maintaining standards of conduct for all DOC employees.

84.     On or about Mid-1995, Plaintiff adopted the Moorish American faith.

85.     Plaintiff chose to manifest his religious observance and national identity through the name he used to present himself before the public and GOD (NEB ER TCHER - YHWH - ALLAH).

86.     Plaintiff adopted the Moorish Title El and Bey.

87.     Plaintiff changed his entire name from James Dennis Mercer to Yashua Amen Shekhem El Bey.

88.     Plaintiff exercised his fundamental human rights when he presented his name change by proclaiming his nationality as Moorish American pursuant to Article 15 of the Universal Declaration of Human Rights.

89.     Plaintiff notified defendants that he adopted  the Moorish American faith and informed defendants, in good faith, of the rights he honestly believed he possessed as Moorish American.

90.     Plaintiff submitted some or all of the following forms to DOC relating to Moorish American faith and nationality name claim: Moorish Zodiac Constitution, Letter of Credence- Notification of Rights and Immunities, Legal Notice-Declaration of Status and Name Claim.

91.     On or about 1993, Plaintiff, who at the time was under the name James D. Mercer, submitted tax forms to the DOC claiming tax exempt status.

92.     The tax forms submitted by Plaintiff in 1993 consisted of a Certificate of Exemption from withholding in lieu of a W-4 form, Laws Pertaining to Form W-4 and Employer Options.

93.     Plaintiff's submission of these documents in 1993 to the DOC did not generate disruption in the work place

94.     Plaintiff's submission of these documents did not impede the general operation of the DOC.

95.     Plaintiff's submission of these documents did not adversely affect the working relationships between Plaintiff's superiors necessary to the proper functioning of the DOC.

96.     DOC employees who did not claim to be Moors submitted the same or substantially similar tax documents to those submitted by Plaintiff in 1993 when Plaintiff had not yet claimed to be Moorish American.

97.     On or about April 10, 1996, the New York City DOI, under the direction of Defendant Caruso, began an investigation called "99 exemptions" to investigate all employees of DOC who had claimed between 40 or more exemptions on their federal and state tax forms submitted to the DOC.

98.     Defendant Caruso determined that these documents constituted "false tax documents"

99.     On or about June 18, 1996, Defendant Caruso received a printout from the Office of Personnel Administration for the DOC listing all DOC employees who had filed 40 or more exemptions. Eliminating all duplicates, this list contained the names of 780 DOC employees who had filed 40 or more exemptions. During the investigation , Defendant Caruso learned that an additional 748 employees had submitted false tax documents with DOC.

100.    Defendant Caruso submitted this list to the Manhattan District Attorney's Office and the New York State Attorney General's (A.G.'s) Office.

101.    The Manhattan District Attorney's Office and the New York State Attorney Generals office told Defendant Caruso which DOC employees should be arrested.

102.    During the investigation, DOI officials nor DOC officials advised Plaintiff that he is under investigation.

103.    Plaintiff was not arrested.

104.    Defendant Caruso learned that Defendant Kerik's lover, Jeanette Pinero and Kerik's "right hand man", John Picciano submitted false tax documents to the DOC.

105.    On or about July 12, 1996, Defendant Caruso received and read a memorandum from the New York City Police Department (NYPD) claiming, among other things, that an individual involved in a "car stop" was a member of a group known as "The Great Seal Association of Moorish Affairs" and that members of that group had been previously arrested and were suspected of armed robberies and trafficking in high-powered automatic weapons.

106.    Plaintiff was not identified in the NYPD memorandum as having engaged in the conduct addressed.

107.    Plaintiff was never accused of being suspected of "armed robberies" and "trafficking in high-powered automatic weapons".

108.    The NYPD memorandum did not identify the individual involved in the "car stop" as a DOC Corrections Officer.

109.    Plaintiff's only connection to the NYPD memorandum was his status as a member of the "Moorish Nation" and his association with the Great Seal of Moorish American Affairs.

110.    During the "99 exemptions" investigation, Defendant Caruso and/or employees under his supervision, compiled a list of DOC employees who he/they identified as Moorish Americans.

111.    During the tax investigation, approximately 29 DOC employees were wiretapped.

112.    At all time relevant hereto, upon information and belief, one of those wiretapped was Plaintiff herein.

113.    During the tax investigation, informants were used in undercover surveillance operations to attend meetings of the Moorish faith to obtain information.

114.    The DOI's investigation lasted 18 months.

115.    After the conclusion of the 18 month investigation, Defendant Caruso made recommendation to the DOC for the initiation of disciplinary charges against certain DOC employees who filed false tax documents.

116.    Of those employees who were not arrested and criminally charged, on or about December 3, 1997 and on June14, 1999 Defendant Caruso recommended that 21 DOC employees and Plaintiff, respectively, identified as Moorish American, be summarily suspended. Each person was merely informed that they were being summarily suspended because they supplied the DOC with tax forms which contained false information.

117.    Defendant Caruso targeted Moorish Americans, including Plaintiff, for adverse treatment because Moors were a "security concern" because (1) they were affiliated with the "Moorish National " group, and (2) because of documents they submitted to the DOC announcing their religious philosophy and nationality as Moorish American.

118.    On June 14, 1999, Plaintiff was summarily suspended without pay for submission of false tax documents that was submitted back in on or about December  of 1993.

119.    Before ordering Plaintiff's summary suspension, Defendant Caruso did not interview Plaintiff nor any other manner give Plaintiff notice that the NYPD memorandum was the basis for their adverse treatment nor were Plaintiff given an opportunity to be heard on this reason for the summary suspension.

120.    Following Plaintiff's return from an almost 2 year unpaid involuntary medical leave from DOC, within hours of reporting to DOC on June 14, 1999, Plaintiff, rather than being reinstated

to full duty, was instead placed on summary suspension without pay for over 30 days and subsequently placed on modified duty in an asbestos contaminated facility.

121.    On or about early December 1997, Giuliani referred to Plaintiff's religious beliefs as a "scheme" and referred to the "Moorish National" group as a "cult".

122.    At all time relevant hereto, on or about 1997 Defendant Giuliani publicly announced, prior to the holding of administrative hearings, that all employees charged with failing to file state and city income tax returns and who had been suspended "would almost certainly lose their jobs after disciplinary proceedings against theme were completed". This speech did not mentioned Moors.

123.    On or about December 8, 1997, Edward Kuriansky (herein after Kuriansky-non-party herein), Commissioner of the New York City Department of Investigation, publicly announced that Plaintiff's Moorish American religious philosophy "is extremely offensive and serious conduct" and further stated that "for a sworn law enforcement officer, who carries a gun, who have taken an oath to the United States and the state constitution, and for all other purposes claims the benefits of citizenship, who has the gall not to pay his fair share - I mean it's really outrageous".

124.    Kuriansky made these statements with full knowledge that other DOC employees, law enforcement officers, who did not claim to be Moors, submitted false tax documents to the Department claiming either "99" exemptions or to be tax exempt and who also submitted documents to the Department claiming that they were not subject to the jurisdiction of the United States and/or the State of New York.

125.    In early February 1998, the World Service Authority contacted Defendant Caruso and advised Caruso that use of the name "Bey" was an effort to assert the right to change nationality and to manifest religious observance, and that this right was being violated by DOC.

126.    On or about 1998, Defendant Caruso issued a Memorandum of Complaint to the DOC recommending that Plaintiffs who are Moorish American as referenced in the Oba Hassan Wat Bey case be terminated because they submitted false tax instruments to the DOC and engaged in conduct unbecoming an officer or member of the Department.

127.    On or about 1999, Defendant Caruso issued a Memorandum of Complaint to the DOC recommending that Plaintiff who is Moorish American be terminated because he submitted false tax instruments to the DOC and engaged in conduct unbecoming an officer or member of the Department.

128.    On July 22, 1999, Plaintiff was placed on modified duty assignment under horrific and filthy working conditions in an asbestos contaminated facility in Brooklyn, isolated from inmates and co-workers.

129.    While on modified duty assignment, Plaintiff was not permitted to possess, carry or purchase a personal firearm, be assigned to any duties requiring the possession, handling, maintenance or security of departmental firearms, chemical agents or funds, and Plaintiff had no responsibility and supervision of cure, custody and control of incarcerated inmates, among other things.

130.    Before being placed on modified duty, Defendant Caruso, nor any other official from the DOI informed Plaintiff that he had been targeted for modified duty because he was deemed to raise "security concerns" because of his association or affiliation  with the Moorish National group.

131.    Before issuing the memorandum of complaint, Defendant Caruso did not interview Plaintiff nor in any other manner given notice that the NYPD memorandum was the basis for his adverse treatment nor were Plaintiff given an opportunity to be heard on this reason for his proposed termination.

132.    On or about August 25, 1998, the DOC Trials Division drafted and served Plaintiff via the United States Postal service Charges and Specifications charging Plaintiff with submitting false instruments concerning taxes to the Department and with violating his oath of office.

133.    Defendant Caruso did not summarily suspend DOC employees who did not claim to be Moors but who also submitted false tax documents to the Department.

134.    On or about November 3, 1999, at the pre-trail hearing Plaintiff was offered the choice of resignation without the possibility of obtaining any other city job or termination. Plaintiff accepted neither.

135.    At all time relevant hereto, Defendant Caruso requested Plaintiff's summary suspension following his return from an unpaid involuntary medical leave.

136.    On or about March 14, 2000, the ALJ Tompkins (herein after ALJ - non-party) issued a Report and Recommendation in connection with the charges and specifications.

137.    At no time did the ALJ mentioned in the Report and Recommendation Plaintiff's objections and pending federal cases against the City and Giuliani.

138.    The ALJ made a determination of federal tax law regarding the submission of an in lieu of W-4 form and factual finding that Plaintiff violated tax law and committed a crime under New York State penal law.

139.    On or about April 27, 2000, Defendant Kerik adopted the ALJ's report and recommendation, which excluded Plaintiff's objections and noticing of pending federal civil

actions. That day, Defendant Kerik imposed the sanction of discharge for submitting false tax documents to the DOC.

140. Defendant Kerik was not required to adopt the ALJ's recommendation for Plaintiff discharge and had considerable authority and discretion to impose a different sanction.

141. For many years prior to Plaintiff's summary suspension, modified duty placement from a suspension and ultimate discharge, Defendants tolerated the practice of employees claiming excessive exemptions or claiming tax exempt status without objection and without advising or providing fair warning to employees that their conduct could lead to disciplinary or criminal action.

142. DOC employees who submitted false tax documents to the Department but who did not claim to be Moorish American were not subject to the same adverse treatment as the Moorish Americans.

143. White DOC employees who submitted false tax documents to the Department were not subject to the same adverse treatment as the Moorish Americans.

144. Plaintiff's unpaid summary suspension in excess of 30 days, which began on June 14, 1999, then into modified duty in an asbestos contaminated facility until Plaintiff's discharged from DOC, was intentional, deliberate, malicious and in conspiracy by Defendants to discharge Plaintiff from employment on April 27, 2000 because of being Moorish American.

145 On May 27, 1999, Oba Hassan Wat Bey (Robert Watson) and five other discharged Moorish American employees filed a civil action in the Southern District of New York, 99 Civ. 3873, protesting their discharge as unconstitutional.

146. On or about May of 2000, Plaintiff filed a civil action in the Southern District of New York, 00 Civ 9260 (JES), protesting his discharge as unconstitutional.

147.   On February 4, 2000, the DOC legal Division contacted its investigation and trials unit to determine whether similar changes of misconduct, i.e. filing false tax documents, had been brought against DOC employees who did not claim to be Moors.

148.   On March 16, 2000, Josephine Pradegan, Caruso's immediate subordinate, gave the Legal Division a list of 10 DOC employees who did not claim to be Moors against whom similar charges of filing false tax documents had been filed.

149.   Virtually all employees on that list had been selected for arrest by state and federal authorities and were not in the same category with Plaintiff and other Moors similarly situated.

150.   Beginning on or about  January 30, 2001, Defendant Caruso submitted a memorandum and complaint to the DOC for about 117 DOC employees who submitted the same or substantially similar documents to the DOC as those submitted by Moorish Americans.

151.   Defendant Caruso recommended that disciplinary action against most of these individuals be deferred.

152.   These employees, the DOC employees who submitted false tax documents to the DOC, but who did not claim to be Moors, were never discipline and evidence was produced on the record of the Oha Hassan Wat Bey case.

153.   On or about August 17, 2005, Plaintiff filed civil action, Shekhem El Bey, vs. City of New York, et. al. 05 Civ. 7270, based on what was then new information learned for the first time that Defendant Caruso selected Plaintiff for summary suspension, modified duty placement and recommended discharge because Defendant Caruso determined that Plaintiff because of being a Moor is a potential security concern due to Defendant Caruso's receipt of the NYPD memorandum and Plaintiff's affiliation with the "Moorish National" group. Defendants concealed the true nature of the charges against Plaintiff.

154.    Between 1996 and April 27, 2000, Defendant Caruso did not order the summary suspension and modified duty assignment for any white DOC employees who submitted the same or substantially similar documents as those submitted by the Moorish Americans, including, but not limited to: John Sheridan, Carlo Pannizzo, John Russo, D. Ryan, D. Sabatano, James Salvio, George Sheehy, Nicholas Varounis, Jr., P. Venechanos, Joseph Vicenzo, Richard Weiss, and evidence was produced on the record of the Oha Hassan Wat Bey case.

155.    During the tax investigation, Defendant Caruso kept various lists of identified Moors who were DOC employees. Plaintiff is one of those Moors listed and evidence was produced on the record of the Oha Hassan Wat Bey case.

156.    Defendant Caruso did not recommend summary suspension, modified duty or discharge for Defendant Kerik's lover, Jeannette Pinero or his "right hand man", John Picciano despite his knowledge that they submitted false tax documents to DOC, and to that effect evidence was produced on the record of the Oha Hassan Wat Bey case.

157.    Defendants claim that they were justified in summarily suspending, ordering modified duty and terminating Plaintiff's employment, and the employment of all other Moorish Americans DOC employees, only because Plaintiff and they are a security concern due to his and their affiliation with the Moorish National Group, and evidence to that effect was produced on the record of the Oha Hassan Wat Bey case.

158.    Defendants did not identify and target for adverse employment treatment members of other religious groups for engaging in the same or substantially similar conduct as Plaintiff.

159.    Defendant Kerik and Caruso in furtherance of their conspiracy in corroborating their collective efforts and in support by their subordinates, by implementing a systemic policy, custom and/or practice aimed at targeting Moorish Americans for adverse employment treatment and actions because of Plaintiff's speech on matters of public concern, Plaintiff's association or

affiliation with the "Moorish group" and/or the Great Seal of Moorish American Affairs, by selectively enforcing DOC rules and regulations against employees identified as Moorish Americans because of race, religion or national origin Defendant Caruso and Defendant Kerik violated Plaintiff's fundamental human rights and constitutional rights to freedom of speech, freedom of association, equal protection of the law and due process of law.

160. Defendant Giuliani abused his office when it was communicated through Defendant Kerik at the closed door meeting in 1998 that "**these people were going to be fired for the actions that they had taken**", referring to the Moors, in effect nullified the independence and integrity of OATH, denying Plaintiff due process of law, wherein the conduct of OATH is at the direction of the Mayor per Mayor's Executive Order 32, which is codified in the City's Charter under Chapter 45-A.

161. By failing to remedy Defendant Caruso's inhuman and unconstitutional wrongs against Plaintiff, by allowing and/or permitting Defendant Caruso's systemic policy, customs or practice aimed at targeting Moorish Americans for adverse employment actions to continue, by failing or refusing to order the DOC's Investigation and Trails Unit to conduct an independent investigation of the basis of the charges and specifications against Plaintiff and by being negligent in managing Defendant Caruso and DOC subordinates who caused and/or substantially contributed the unconstitutional deprivations and human rights abuse visited upon Plaintiff.

162. At all time relevant hereto, pursuant to Article 62 of the Civil Service Law of the State of New York, Defendant Giuliani, Kerik, Caruso and Fraser sworn or affirmed an oath to uphold the Constitution of the United States and the Constitution of the State of New York.

163. At all time relevant hereto, Defendant Giuliani, Kerik, Caruso and Fraser, new or should have reasonably known that their conduct in targeting Plaintiff for adverse employment action and discharge because of being a Moor or Moorish American violates their Oath of office in their respective position of influence and authority.

164.   Defendant Kerik violated Plaintiff's fundamental human rights and constitutional rights to freedom of speech, freedom of association, equal protection of the law and due process of law.

165.   Defendant Caruso violated Plaintiff's fundamental human rights and constitutional rights Freedom of Association, freedom of speech, freedom of association, equal protection of the law and due process of law.

166.   On December 18, 2013, the reading of the Jury verdict was announced, which was unanimous, and that it was found by a preponderance of the evidence that the motivating factor for the adverse employment action against those Plaintiffs, to whom Plaintiff herein is similarly situated, is because of being Moorish American or Moor, among other things, to include Religion, Association and 42 U.S.C. § 1983 claims, as set forth in the Jury verdict.

167.   At all time relevant hereto, the conduct of the OATH proceedings was compromised  by Giuliani in which Plaintiff, and those similarly situated was denied due process of law.

168.   At all times relevant, Defendant Giuliani acted under color state law in using his political power and position to influence the conduct of OATH in carrying out his intentions to discharge Moors from employment, as Plaintiff herein and the Plaintiffs in the Oba Hassan Wat Bey case.

169.   At all time relevant hereto, OATH's impartiality was and/or is compromised by the City's financial and/or pecuniary interest in which it becomes enriched in the imposition of economic penalties, i.e. termination or discharge from city employment and lost of pension following the recommendation of the ALJ for city officials as was Defendant Kerik when he discharged Plaintiff employment with DOC, as he did with the Plaintiff's in the Oba Hassan Wat Bey case.

170.   At all time relevant hereto, OATH was merely used as a "rubber stamp" by Defendant Giuliani and Kerik to discharge or terminate Plaintiff's employment, as was the Plaintiffs in the Oba Hassan Wat Bey case (cite omitted) because of being a Moor or Moorish American.

171.   At all times relevant hereto, the OATH proceedings deprived Plaintiff as did the Plaintiff's in the Oba Hasan Wat Bey case (cite omitted) of due process of law because OATH

was subjected to the undue influence of Defendant Giuliani in which it was indicated by Defendant Kerik at a closed door meeting in 1998 " **these people were going to be fired for the actions that they had taken**" and "**They were referred to as the Moors**".

172.    By promulgating, executing and/or implementing in a conspiracy, a policy, custom, practice, statement, ordinance, or regulation or by adopting  and ratifying a decision promulgated by DOI policy-making officials to target all DOC employees of the Moorish American faith for adverse employment actions in violation of Plaintiff's and similarly situated DOC employees fundamental human rights and constitutional rights to freedom of speech, freedom of association, equal protection of the law and due process of law, where DOI officials regularly attended and participated in "leadership" meetings with then-Mayor Giuliani to keep the Mayor informed of all investigations  and where Giuliani approved of the investigation leading to Plaintiff's discharge and those of the Oba Hassan Wat Bey case, and where Giuliani made announcements in the media approving of the investigation and the discharge of Moorish Americans-although DOC employees who did not claim to be Moors engaged in the same or substantially similar misconduct, Defendant City violated Plaintiff's fundamental human rights and Constitutional Rights.

173.    As a legal and proximate result of Defendant Giuliani, Kerik's, Caruso, and other co-conspirators not yet named or should be named herein, violates 42 U.S.C. 1985(3).

174.    Plaintiff have suffered and continues to suffer substantial losses, including the loss of past and future earnings, promotional opportunities, bonuses, deferred compensation, overtime, night differential and other fringe benefits;

175.    Plaintiff has suffered and continue to suffer impairment and damage to his good name and reputation; Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

176.    The conduct of Defendants shocks the conscience and were outrageous and malicious, was intended and for the purpose to, and in fact, injured Plaintiff and was done with reckless and depraved indifference to Plaintiff's fundamental human, constitutional and civil rights, entitling Plaintiff to an award of equitable and ancillary relief, compensatory and punitive damages against the individual Defendants.

## COUNT I
### (42 U.S.C. § 1985 (3) - Conspiracy)

177.    Plaintiff repeat and reallege paragraph 1 through 176 above with the same force and effect as if set forth herein.

178.    By engaging in a policy, custom and/or practice of targeting Moorish Americans for adverse treatment, Defendant Kerik, Caruso, Fraser, with the "meeting of the minds" conspired behind closed doors and selectively targeted Moorish Americans to which Plaintiff has been identified for adverse employment actions, including but not limited to, an almost 2 year unpaid involuntary medical leave, summary suspensions, modified duty in an asbestos contaminated facility and discharge from employment, for the intent and purpose of denying Plaintiff the equal protection under the law, and utilizing OATH as a "rubber stamp" as part of their conspiracy and as a mechanism and tool with which to facilitate Plaintiff's discharge from City employment, as OATH was subjected to the inappropriate influences of Defendant Giuliani, whereby Plaintiff is injured in his property interest and denied the right to the equal protection under the law, to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

## COUNT II
### (42 U.S.C. § 1986 - Neglect to Prevent Conspiracy)

179.    Plaintiff repeat and reallege paragraph 1 through 178 above with the same force and effect as if set forth herein.

180.    Defendants, individually and collectively, knew or should have reasonably known of their wrongs conspired to be done to Plaintiff and those similarly situated because of being a Moor or Moorish American or of the Moorish American faith, and having power to prevent or aid in preventing the commission of same, neglected or refused so to do when Defendants and each of them by reasonable diligence could have prevented, thus causing Plaintiff a damage to which Plaintiff is entitled to equitable and anciliary relief as a matter of law.

### COUNT III
### (42 U.S.C. § 1981 - Discrimination)

181.    Plaintiff repeat and reallege paragraph 1 through 180 above with the same force and effect as if set forth herein.

182.    Plaintiff is a Moor or Moorish American who adopted the Moorish American faith.

183.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment due solely to Plaintiff association with Moorish American faith and religion, Defendants violated Plaintiff's rights to be free from race and religious discrimination to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

184    DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged Plaintiff.

185.    Plaintiff's race and religion was at least a motivating factor in his discharge.

186.    Defendants conduct and actions has caused Plaintiff to suffer damages, and to which Plaintiff is entitled to the same or similar relief as set forth in the Oba Hassan Wat Bey case.

### COUNT IV
### (42 U.S.C. § 1983 - Due Process)

187.    Plaintiff repeat and reallege paragraph 1 through 186 above with the same force and effect as if set forth herein.

188.    By intentionally and willfully concealing the true nature of the charges against Plaintiff, and in conspiracy thereof wherein lies the fraud, targeting Moorish Americans for termination of employment and utilizing OATH as a "rubber stamp" and subjecting it to inappropriate influences, acted "under color of statute, ordinance, regulation, custom, or usage, of the State or Territory of New York, and acted under color of state law" Defendant engaged in a policy, custom and/or practice to deprive Plaintiff of due process of law, i.e., the right to adequate notice and an opportunity to be heard before an impartial fact finder on the actual charges against Plaintiff before a deprivation of a property interest in his employment, in violation of the 14th Amendment to the United States Constitution. to which Plaintiff is entitled to equitable and ancillary relief as a matter of law

189.    By engaging in a, policy, custom and practice of targeting Moorish Americans for adverse treatment and termination or discharge from employment, Defendant Giuliani, Kerik, Caruso and Fraser, and each of them and collectively and through their subordinates violated Plaintiff's rights to due process of law pursuant to the 14th Amendment to the U.S. Constitution.

### COUNT V
### (42 U.S.C. § 1983 - Equal Protection- Selective Enforcement & Prosecution)

190.    Plaintiff repeat and reallege paragraph 1 through 189 above with the same force and effect as if set forth herein.

191.    By Selectively subjecting  Plaintiff, Moorish Americans, and other Moorish Americans and those by association, for adverse employment actions compared with other similarly situated, where the selective treatment was based on race, religion, the intent to inhibit the exercise of constitutional rights and a malicious or bad faith intent to injure Plaintiff, as those Plaintiff in the Oba Hassan Wat Bey case, Defendants engaged in a policy, custom and/or practice to violate Plaintiff's  rights to equal protection of the law, to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

## COUNT VI
### (42 USC § 1983 - Freedom of Association)

192.    Plaintiff repeat and reallege paragraph 1 through 191 above with the same force and effect as if set forth herein.

193.    By imposing an almost 2 year involuntary unpaid medical leave, summarily suspending Plaintiff, ordering Plaintiff's modified duty placement and recommending Plaintiff for termination, and in fact discharging Plaintiff, and treating Plaintiff as a "security concern" for no reason other than the fact that Plaintiff is affiliated with the "Moorish National group" identified in an NYPD memorandum and because Plaintiff submitted documents to the DOC announcing his religious philosophy, the Defendants engaged in a policy, custom and/or practice to violated Plaintiff's First Amendment right to freedom of association as purview through the 14th Amendment to the United States Constitution, in which Plaintiff suffered damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

## COUNT VII
### (42 USC § 1983 - Freedom of Speech)

194.    Plaintiff repeat and reallege paragraph 1 through 193 above with the same force and effect as if set forth herein.

195.    By basing their decision to summarily suspend, place on modified duty in a asbestos contaminated facility and terminate Plaintiff on the content of his speech, documents submitted to the DOC, on a matter of public concern, professing adoption of the Moorish American faith and Plaintiff's rights and immunity(ies) as a member of that religious faith, pursuant to the DOC's policy prohibiting discrimination on the basis of religion, Defendant engaged in a policy, custom and/or practice to violated Plaintiff right to freedom of speech, causing Plaintiff a damage to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

## COUNT VIII
### (NYS - Selective Prosecution)

196.    Plaintiff repeat and reallege paragraph 1 through 195 above with the same force and effect as if set forth herein.

197.    By Selectively subjecting  Plaintiff, Moorish Americans, and other Moorish Americans, for adverse employment actions compared with other similarly situated, where the selective treatment was based on race, religion, the intent to inhibit the exercise of constitutional rights and a malicious or bad faith intent to injure Plaintiff, as those Plaintiff in the Oba Hassan Wat Bey case, Defendants engaged in a policy, custom and/or practice to violate Plaintiff's  rights to equal protection of the law, to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

## COUNT IX
### (NYS-Malicious Prosecution)

198.    Plaintiff repeat and reallege paragraph 1 through 197 above with the same force and effect as if set forth herein.

199.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment, retaliation and having been found by preponderance of the evidence in the Oba Hassan Wat Bey case in violation of "equal protection", "discrimination" and denial of due process" show Malicious Prosecution.

## COUNT X
### (NYS-Intentional Infliction of Emotional Distress)

200.    Plaintiff repeat and reallege paragraph 1 through 199 above with the same force and effect as if set forth herein.

201.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment. By engaging in a policy, custom and practice of targeting Moorish Americans

for adverse treatment, Defendant Giuliani knew or should have known that his conduct, as expressed through Defendant Kerik and his subordinates Defendant Rubin, to include the subordinates of Defendant Giuliani, vis-a-vis the conduct of OATH through Defendant Rubin, with reckless and depraved indifference caused Plaintiff harm that was planned behind a closed door DOC meeting held by Defendant Kerik.

## COUNT XI
### (NYS-Negligent Infliction of Emotional Distress)

202.    Plaintiff repeat and reallege paragraph 1 through 201 above with the same force and effect as if set forth herein.

203.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment Defendant Giuliani knew or should have known that his conduct, as expressed through Defendant Kerik and his subordinates, to include the subordinates of Defendant Giuliani, vis-a-vis the conduct of OATH through Defendant Rubin, with reckless and depraved indifference intentionally cause the harm that was expressed in the closed door DOC meeting held by Defendant Kerik.

## COUNT XII
### (NYS Constitution - Due Process)

204.    Plaintiff repeat and reallege paragraph 1 through 203 above with the same force and effect as if set forth herein.

205.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment in which Plaintiff was discharge from employment suffering the lost of a property interest in his employment, violates the New York State Constitution, Bill of Rights, Article 1, Section 6, 2nd paragraph.

## COUNT XIII
### (NYS Constitution - Equal Protection)

206.    Plaintiff repeat and reallege paragraph 1 through 205 above with the same force and effect as if set forth herein.

207.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment, Defendants, and each of them and in corroboration with their subordinates violated Plaintiff rights as a New York State Citizen under Article 1, Section 11 of the New York State Constitution.

## COUNT XIV
### (Employment Discrimination - New York State Human Rights Law)

208.    Plaintiff repeat and reallege paragraph 1 through 207 above with the same force and effect as if set forth herein.

209    Plaintiff is a Moor or Moorish American.

210.    By engaging in a pattern and practice of targeting Moorish Americans for adverse treatment due solely to Plaintiff's association with the Moorish American faith, Defendants violated Plaintiff's right to be free from race and religious discrimination.

211.    DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

212.    Plaintiff's race and religion was at least a motivating factor in his discharge.

213.    Defendants conduct has caused Plaintiff to suffer damages as more fully stated above.

## COUNT XV
### (Employment Discrimination - New York City Human Rights Law)

214.    Plaintiff repeat and reallege paragraph 1 through 213 above with the same force and effect as if set forth herein.

215.   Plaintiff is a Moor or Moorish American

216.   By engaging in a pattern and practice of targeting Moorish Americans, and in conspiracy thereof, for adverse treatment due solely to Plaintiff's association with the Moorish American faith, Defendants violated Plaintiff's right to be free from race and religious discrimination.

217.   DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

218.   Plaintiff's race and religion were at least a motivating factor in his discharge

219.   Defendants conduct has caused Plaintiff to suffer damages as more fully stated above.

## JURY DEMAND

220.   Plaintiff demands a trail by jury on all issues of facts to be decided by the Jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Pray that this Court grant judgment containing the following relief:

a.   To set aside the Stipulation of Dismissal in case Jawan Akil Bey, et. al. vs. The City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) on the grounds of fraud per FRCP 60(d)(1) and (3).

b.   To set aside the judgment order in Shekhem El Bey v. City of New York, et. al. 00 Civ. 9260 (JES) on grounds of newly discovered information and evidence giving rise to fraud and conspiracy per FRCP 60 (d)(1) and (3); FRCP 60 (d) (3).

c.   An award of Thirteen Million Dollars as sum certain ($13,000,000.00) for combined punitive and compensatory damages, encompassing but not limited to: loss of wages, overtime, benefits and promotional opportunities, including an award of front pay, loss of future salary and

benefits, out of pocket expenses, and for mental anguish, pain and suffering, humiliation, embarrassment, and emotional injury;

d.      Full Reinstatement to employment with the New York City Department of Correction as a Correction Officer and then retired as a Captain shortly thereafter, including expunging of adverse comments in Plaintiff's personnel file, restoration of seniority, and full pension and benefits.

e.      To Declare this actions as a Class Action by extension to protect Moorish Americans seeking present or future employment with the City of New York in general.

f.      To Declare the actions of Defendants a violation of Plaintiff's fundamental human rights with respect to Article 15 of the Universal Declaration of Human Rights.

g.      Leave to amend the complaint pursuant to Rule 15 (a) and (b) of the FRCP in the event further and new information or evidence requires new parties to be joined in as Defendants, and as to such other corrections needed to perfect the pleadings.

h.      An award of all Court Cost, fees and incurred expenses of this action.

i.      Such other and further relief as the Court may deem reasonable or appropriate and just under the circumstances.

I, Yashua Amen Shekhem El Bey declare under penalty of perjury that the foregoing is true and correct:

DATED: _12/19/2013_____

Signature: _Yesh Am Sheh I Bey_

Name: _Yashu Amen Shekhem El Bey_

STATE OF NEW YORK
COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me this _19_ day of _12_, 20_13_, by _YASHVA AS EL Bey_

Anil Taneja  Notary Public
My Commission Exp. October 06, 2017

C/O 244 Fifth Avenue, Suite 200
New York, New York 10001

# VERIFICATION

STATE OF NEW YORK    )
                              ) as:
COUNTY OF NEW YORK)

BEFORE ME personally appeared: ___YASHUA AMEN SHEKHEM EL BEY___

who, being by me first duly affirmed and identified in accordance with New York State Law,

deposes and says:

My name is Yashua Amen Shekhem El Bey, the Plaintiff herein.

I have read and understand the attached foregoing verified civil complaint, and each fact alleged

therein is true and correct of my own personal first hand knowledge.

FURTHER THE AFFIANT SAYETH NAUGHT.


                                                    Yashua Amen Shekhem El Bey, Affiant


Affirmed To and subscribed before me this _19_ day of _December_ 2013.

_____
Notary Public

My Commission Expires:_____

§

§

§

§

§

§

§

§

§

§

§

# Exhibit A

CCALBEY1                    Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   OBA HASSAN WAT BEY, et al.,

 4                Plaintiffs,

 5          v.                          99 CV 3873 (AJN)
                                        01 CV 9406 (AJN)
 6   THE CITY OF NEW YORK, et al.,

 7                Defendants.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      December 10, 2012
                                        9:18 a.m.
10
     Before:
11
                     HON. ALISON J. NATHAN,
12
                                        District Judge
13
                         APPEARANCES
14
     THOMAS & ASSOCIATES
15       Attorneys for Plaintiffs
     BY:  IRENE DONNA THOMAS
16       -and-
         DAVID SCHLACHTER
17
     NEW YORK CITY LAW DEPARTMENT
18   OFFICE OF THE CORPORATION COUNSEL
         Attorneys for Defendants
19   BY:  MAXWELL D. LEIGHTON
         RICARDO TAPIA
20       JAMES M. LEMONEDES

21

22

23

24

25
```

CCALBEY3                    Blake - recross

1   exemptions they claim.  Respondents' beliefs, as sincere as

2   they may be, do not present colorable legal claims."

3              MR. TAPIA:  Thank you.  I have no further questions.

4              THE COURT:  All right.  Ms. Blake, you may step down.

5   Thank you.

6              (Witness excused)

7              THE COURT:  Who's the next witness, please?

8              MS. THOMAS:  Terrence Skinner.

9              THE COURT:  Please bring in Mr. Skinner.

10             Is someone getting Mr. Skinner?

11             MS. THOMAS:  Yes.

12             THE COURT:  Good afternoon, Mr. Skinner.  Come on up,

13   please.

14    TERRENCE SKINNER,

15       called as a witness by the Plaintiffs,

16       having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. THOMAS:

19   Q.  Good morning, Mr. Skinner.

20             Are you currently employed?

21   A.  No, I'm not.

22   Q.  Between 1997 and 1998, where were you employed?

23   A.  The New York City Department of Correction.

24   Q.  And how long had you -- were you employed by the New York

25   City Department of Correction?

CCALBEY3                          Skinner - direct

```
 1    A.  At that time, 14 years.
 2    Q.  And what was your job title at that time during that
 3    period?
 4    A.  I was a deputy warden, the executive officer to the chief
 5    of security.
 6    Q.  And who was your immediate superior?
 7    A.  Chief William Fraser.
 8    Q.  And what was his job title, he was chief of the department?
 9    A.  He was chief of security.
10    Q.  Now, who was Commissioner of the New York City Department
11    of Corrections at that time?
12    A.  Bernard Kerik.
13    Q.  And the mayor?
14    A.  Rudolph Giuliani.
15    Q.  Now, what were your job duties as executive officer to the
16    chief of security?
17    A.  Responsibilities included managing overall security
18    throughout the entire department.
19    Q.  And did you have any responsibilities in connection with
20    the gang intelligence unit?
21    A.  Yes.  The chief of security's office oversaw the gang
22    intelligence unit.
23    Q.  And did you have particular responsibilities in connection
24    with that unit?
25    A.  I had previously been the commanding officer of the gang
```

CCALBEY3                          Skinner - direct

1    intelligence unit.

2    Q.  Who was responsible for establishing the unit?

3    A.  It was Chief Taylor.  Initially, the unit was the gang task

4    force.  I was asked to conduct an analysis of how it operated

5    and what it did.  I did that, and then I was placed in charge

6    of the new gang intelligence unit.

7    Q.  Now, was the gang intelligent unit ever used for a purpose

8    other than its original intent?

9    A.  One time, at some point in 1998 between August and December

10   of 1998.

11   Q.  And what happened at that time?

12   A.  We were instructed by the Inspector General, Mike Caruso,

13   to have the gang intelligence unit conduct video surveillance

14   of a protest at 60 Hudson Street.

15   Q.  And was there a meeting held to plan the surveillance?

16   A.  Initially there was a meeting between myself, Chief Fraser,

17   Commissioner Kerik, and his chief of staff, John Piciano.  And

18   at that meeting we were instructed that Mike Caruso would

19   contact us and that we should do what he needed us to do

20   regarding our surveillance of the demonstration that was going

21   to take place.

22   Q.  And what was the concern that was raised at that meeting

23   concerning the surveillance activity?

24   A.  The commissioner indicated that the mayor had held a press

25   conference and indicated that these people were going to be

CCALBEY3                     Skinner - direct

1    fired for the actions that they had taken and that this was an

2    important issue, so we should do what was necessary to assist

3    the Inspector General's Office in trying to gather information

4    against this group.

5    Q.  And what group were you referring to, sir?

6    A.  They were referred to as the Moors.

7    Q.  Now, did you actually conduct surveillance at the 60 Hudson

8    Street location?

9    A.  The gang intelligence unit did do video surveillance of the

10   demonstration, yes.

11   Q.  Were you present during that surveillance?

12   A.  I wasn't with them, but I was present at 60 Hudson Street,

13   out on the street, observing the protest.

14   Q.  At any time did the gang intelligence unit remove

15   individuals from the 60 Hudson Street location?

16   A.  No.  It was the security for the actual demonstration was

17   done by the NYPD.  The gang intelligence unit was in an

18   undercover vehicle and they did the surveillance.  And it was

19   peaceful, there were no issues, and basically that was the end

20   of the surveillance.

21          MS. THOMAS:  Thank you very much.  No further

22   questions save any redirect.

23          THE COURT:  Anything, Mr. Schlachter?

24          MR. SCHLACHTER:  No questions, your Honor.

25          THE COURT:  Who will be examining?

CCALBEY3                          Skinner - direct

1          MR. TAPIA:  Yes, your Honor, I have a few questions.

2          THE COURT:  Mr. Tapia.

3     CROSS-EXAMINATION

4     BY MR. TAPIA:

5     Q.  Good morning, Mr. Skinner.

6     A.  Good morning.

7     Q.  Did you have a lawsuit where you sued the City of New York

8     and the Department of Corrections previously?

9     A.  Yes, I did.

10    Q.  And that lawsuit was resolved?

11    A.  Yes, it was.

12    Q.  Now, have you spoken to Ms. Thomas, Irene Donna Thomas, in

13    the past?

14    A.  Yes, I have.

15    Q.  Have you ever spoken to me in the past?

16    A.  Not that I know of.

17    Q.  And what about Mr. Maxwell Leighton, have you spoken to

18    him?

19    A.  He looks familiar but I don't think so.

20    Q.  As far as any of the tax records that were submitted by the

21    plaintiffs in this case, have you seen any of those documents?

22    A.  I have not.

23    Q.  Have you read any of the decisions issued by the

24    administrative law judge in these cases?

25    A.  No, I have not.

CCALBEY3                    Skinner - cross

1    Q.  And as far as the demonstrations that were held that day,

2    were they stopped at all in any way?

3    A.  No.  It was just one demonstration.

4              MR. TAPIA:  I have nothing further.  Thank you.

5              THE COURT:  Ms. Thomas.

6    REDIRECT EXAMINATION

7    BY MS. THOMAS:

8    Q.  Mr. Skinner, without going into the specifics of your

9    lawsuit, what was its resolution?

10   A.  The case was decided in my favor.

11             MR. TAPIA:  Objection, your Honor.

12             THE COURT:  Overruled.  Go ahead.

13   A.  The case was decided in my favor, a jury trial.

14   Q.  And were you satisfied with that?

15   A.  Yes, I was.

16             MS. THOMAS:  No further questions, your Honor.

17   RECROSS EXAMINATION

18   BY MR. TAPIA:

19   Q.  Now, did your case have anything to do with the Moorish

20   American faith?

21   A.  No, it did not.

22   Q.  Did it have anything to do with these seven individuals in

23   this courtroom?

24   A.  No, it did not.

25   Q.  By the seven individuals, obviously, I mean the plaintiffs.

CCALBEY3                    Skinner - recross

1    A.   No.

2    Q.   Okay.  And as far as the verdict in your favor, you

3    actually settled the case after the verdict, correct?

4    A.   The city appealed and then there was a settlement, yes.

5              MR. TAPIA:  Thank you so much.

6              THE COURT:  You may step down.  Thank you.

7              THE WITNESS:  Leave?

8              THE COURT:  Yes, you may.

9              (Witness excused)

10             THE COURT:  Ms. Thomas, who will be the next witness?

11             MS. THOMAS:  Mr. Andrew Fenneck.  Is he here?

12             MR. LEIGHTON:  Give me 30 seconds.  I have to see

13   which witness is present.

14             THE COURT:  I invite you to stand in place and stretch

15   if you like.

16             MR. LEIGHTON:  Your Honor, I believe both witnesses or

17   the next witness is on the 8th floor.  We moved a little more

18   quickly than I expected.  They are present; I know they're

19   there.  It's your discretion if you wish for me to get them and

20   bring them up.

21             THE COURT:  I do.  I'll let the jury take a break

22   rather than sitting here.  You can go back to the room for

23   about five minutes.

24             (Continued on next page)

25



§

§

§

§

§

§

§

§

§

§

§

# Exhibit B

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _11/5/13_

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

OBA HASSAN WAT BEY, et al.,

                                    Plaintiffs,

                -against-

THE CITY OF NEW YORK, et al.,

                                    Defendants.

----------------------------------------------------------X

99 **CIVIL** 3873 (AJN)
01 **CIVIL** 9406 (AJN)

## AMENDED JUDGMENT

#12,2265

Following a trial held from December 4 through December 13, 2012, a jury having rendered

a verdict finding in favor of Plaintiffs and against Defendants City of New York ("the City"),

William Fraser ("Fraser"), and Bernard Kerik ("Kerik") (collectively, "Defendants"); thereafter,

post-trial motions were filed by the parties in the above-captioned employment discrimination

action; on September 4, 2013, this Court having rendered a Memorandum and Order granting

Defendants' motion to vacate the award of punitive damages, but denying the remainder of

Defendants' motion, granting Plaintiffs' motions for pre-and post-judgment interest, but denying

the remainder of Plaintiffs' Rule 59 and 60 motions, granting Plaintiffs' motions for attorney's fees

and costs in part, awarding Ms. Thomas $1,271,573.96 in fees and costs, awarding Mr. Schlachter

$175,253.50 in fees and costs, and directing the Clerk of the Court to correct the judgment

previously entered, Dkt. No. 396, to reflect this Order, and the matter having come before the

Honorable Alison J. Nathan, United States District Judge, and the Court, on October 22, 2013,

having rendered its Order granting Plaintiffs' request for calculation of prejudgment interest, and

directing the Clerk of the Court to calculate prejudgment interest according to the methodology

described in Section IV.B of the Court's Memorandum and Order dated September 4, 2013, see Dkt.

No. 501, at 60-61, and using the dates given in Plaintiffs' letter dated October 22, 2013, Dkt. No.

529, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum and Order dated September 4, 2013 and Order dated October 22, 2013, Defendants' motion to vacate the award of punitive damages is granted, but the remainder of Defendants' motion is denied; judgment is entered as follows: in favor of plaintiff Robert Watson in the amount of $488,000 plus pre-judgment interest of $106,071.41 for a total of $675,404.75; in favor of plaintiff Pedro Rivera Sr. Bey in the amount of $467,000 plus pre-judgment interest of $87,005.89 for a total of $554,005.89; in favor of plaintiff Alberto Rivera Bey in the amount of $405,000 plus pre-judgment interest of $40,994.00 for a total of $445,994.00; in favor of plaintiff Hassan Abdallah in the amount of $467,000 plus pre-judgment interest of $87,005.89 for a total of $554,005.89; in favor of plaintiff Edward Ebanks in the amount of $300,000 plus pre-judgment interest of $55,892.44 for a total of $355,892.44; in favor of plaintiff Michael Nichols in the amount of $379,000 plus pre-judgment interest of $70,610.77 for a total of $449,610.77; in favor of plaintiff Herbert Hinnant in the amount of $300,000 plus pre-judgment interest of $55,892.44 for a total of $355,892.44; all as against defendant City of New York; Plaintiffs' motions for pre-and post-judgment interest are granted, but the remainder of Plaintiffs' Rule 59 and 60 motions are denied; Finally, Plaintiffs' motions for attorney's fees and costs are granted in part; Ms. Thomas is awarded $1,271,573.96 in fees and costs, and Mr. Schlachter is awarded $175,253.50 in fees and costs.

**DATED:** New York, New York
November 5, 2013

**RUBY J. KRAJICK**

Clerk of Court

BY:

Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

§

§

§

§

§

§

§

§

§

§

§

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

YASHUA AMEN SHEKHEM'EL-BEY,

               Plaintiff,

    - against -

CITY OF NEW YORK, ET AL.,

              Defendants.

------------------------------------------x

05 Civ. 7270 (TPG)

**ORDER**

U.S. DISTRICT COURT
FILED
APR 3 0 2006
S.D. OF N.Y.

      Pursuant to plaintiff's request in letters dated November 21, 2005 and

April 13, 2006, this case is dismissed without prejudice.

SO ORDERED.

Dated:      New York, New York
              April 19, 2006

                      THOMAS P. GRIESA
                      U.S.D.J

MICROFILM   APR 2 1 2005   9 00 AM

1