UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 2 | 25 | 2014

---------------------------------------------------------------

Yashua Amen Shekhem El Bey, )
)                    Verified Civil Complaint
)
Plaintiff, )            **13 CV 8927 (AJN)(RLE)**
v. )
)
The City of New York; Rudolph Giuliani, )
individually and as former Mayor and Chief )
Executive Officer of the City of New York; Bernard )
Kerik, individually and as former Commissioner of )      2ND AMENDED COMPLAINT
the Department of Correction of the City of New )
York (DOC); William Fraser, individually and as )
former Chief of the Department of the City of New )      Civil Complaint for Damages and
York Department of Correction (DOC); Michael )           Declaratory Relief Based On Newly
Caruso, individually and as former Inspector General )   Discovered Information and Evidence
of the City of New York Department of Investigation )
(DOI); )                **JURY TRAIL DEMANDED**
Defendants, )              **HEREIN**
)
---------------------------------------------------------------

1.      COMES NOW Plaintiff, Yashua Amen Shekhem El Bey, proceeding Pro Se in this action,

complains of municipal Defendants and alleges as follows:

## STATEMENT OF THE CASE

2.      This is a civil action for equitable, ancillary and declaratory relief arising out of newly

discovered information and evidence which revealed fraud, conspiracy and retaliation learned for

the first time in the Oba Hassan Wat Bey, et. al. v. The CITY OF NEW YORK, et. al. 99 Civ. 3873

(AJN) (RLE) & 01 Civ. 9406 (AJN) (RLE) case (herein after, Oba Hassan Wat Bey case) following

the course of it's jury trial proceeding that ended in a unanimous jury verdict in favor of the

Plaintiffs in that case on December 18, 2012.

3.      Plaintiff in this action is similarly situated and inextricably intertwined with the Oba Hassan

Wat Bey case, as the underlining factual circumstances are the same with essentially the same

Defendants with respect to this action and Plaintiff's prior civil cases filed in this court and seeking the same or similar relief, but not limited thereto.

4.    Defendants, and each of them, committed acts under color of state law, in conspiracy, retaliation and fraud thereof, which deprived Plaintiff of fundamental human rights and rights secured under the Constitution and laws of the United States of America and the New York State Constitution.

5.    Defendants intended, and for the purpose in furtherance of their conspiracy, to deprive Plaintiff's rights to equal protection under the law, rights to freedom of association and from discrimination, rights to due process of the law, rights to freedom of speech, and other rights and liberties, including rights pursuant to the New York State Constitution and for refusing or neglecting to prevent those deprivations and denials, causing Plaintiff to suffer damages as did the Plaintiff's in the Oba Hassan Wat Bey case by essentially the same Defendants as will be more fully specified below.

## JURISDICTIONAL ALLEGATIONS

6.    Plaintiff's authority for this "independent action" arises from  FRCP 60 (d)(1) and (3): FRCP 60 (d)(3) in which the Court is empowered to exercise its jurisdiction.

7.    This Court has jurisdiction of this action pursuant Article 3 of the U.S. Constitution and 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 1985 (3), 42 U.S.C. § 1986; 42 U.S.C. § 1981 and 42 U.S.C. § 1983; Including the 1st and 5th Amendment as purview through the 14th Amendment U.S. Constitution. as applicable to the States, including the "equal protection" clause therein.

8.    Jurisdiction is proper pursuant to the Declaratory Judgment Act. 28 U.S.C. § 2201 and for further relief  per 28 U.S.C. § 2202 based on a declaratory judgment, to include FRCP 57.

9.    Jurisdiction is also proper under 28 U.S.C §§ 453, 454 and 455.

10.     Jurisdiction is also proper under Article 6 of the U.S. Constitution and in conjunction with the United Nations General Assembly, December 10, 1948 - Signed and Adopted by the United States of America, the United Nations Universal Declaration of Human Rights, Article 3, 6, 7, 8, 10, 15, 17 (2), 18, 19, 20 (1), 21 (2), and 28; all applicable to Plaintiff's fundamental Human Rights.

11.     The All Writs Act, 28 U.S.C. § 1651 in aid of this Courts Jurisdiction.

12.     This Court has supplemental pendant state jurisdiction over Plaintiff's state law claims arising out of Plaintiff's timely filed Notice of Claim to the City of New York pursuant to 28 U.S.C. § 1367 and with respect to newly discovered information and evidence on the record of the aforesaid Oba Hassan Wat Bey, et. al. v. The City of New York, el. al. (cite omitted) case.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES
## PLAINTIFF

14.     Plaintiff, Yashua Amen Shekhem El Bey, (p/k/a James D. Mercer)(herein after referred to as Plaintiff) is a Moor or Moorish American.

15.     Plaintiff is a Citizen of the United States of America and Citizen of New York State.

16.     Plaintiff is a former employee of the New York City Department of Correction.

17.     Plaintiff was hired by defendant City of New York as a Corrections Officer on June 13, 1983.

18.     Following Plaintiff's  probation as a Correction Officer, Plaintiff was granted a 3 year leave of absence by the Department of Correction to join the United States Army and served from on or about February 20, 1985 to on or about February 20, 1988 and was honorably discharged.

19.    Upon Plaintiff's return from the U.S. Army, Plaintiff was reinstated back to full duty as a Correction Officer  to resume work with the Department of Correction on or about February of 1988.

20.    Plaintiff is domiciled in New York State within New York City, whose mailing address is 244 Fifth Avenue, Suite 200, New York, New York 10001.

21.    Plaintiff was, and at all time relevant to this matter a tenured, permanent, competitive class civil service employee with a property interest in his employment.

22.    During Plaintiff's employment tenure, his job performance has been at least satisfactory.

## DEFENDANTS

23.    Defendant City of New York (herein after City) is a municipal corporation, local governmental unit and is chartered under the laws and constitution of the State of New York and is a recipient of federal funds.

24.    The Defendant City's address is City Hall, New York, New York 10038.

25.    Defendant City is, and at all time relevant hereto, was and/or is an "employee" within the meaning of the New York City Human Rights Laws.

26.    Defendant City is, and at all time relevant hereto, was and/or is an "employee" within the meaning of the New York State Human Rights Laws.

27.    The Defendant City is at all time relevant hereto, a "person" within the meaning of 42 U.S.C. § 1983.

28.    Defendant Rudolph Giuliani (herein after Giuliani) was, and at all times relevant to this matter, the Mayor of the City of New York and the Chief Executive Officer.

29.    Defendant  Giuliani is or was a "person" within  the meaning of 42 U.S.C. § 1983

30.    Defendant Giuliani is being sued in his official and/or individual capacity.

31.    Defendant Giuliani's last known principle place of business is or was City Hall, New York, New York 10038.

32.    Defendant Bernard B. Kerik (herein after Kerik) was, and at all times relevant to this matter, the Commissioner of the City Department of Correction (DOC).

33.    Defendant Kerik was, and at all time relevant to this matter, a "person" within the meaning of 42 U.S.C. § 1983.

34.    Defendant Kerik is being sued in his official and/or individual capacity.

35.    Defendant Kerik's last known principle place of business is or was 60 Hudson Street, New York, New York 10013.

36.    Defendant William Fraser (hereinafter Fraser) was, and at all times relevant to this matter, the Chief of the Department of the City Department of Correction (DOC).

37.    Defendant Fraser was, and at all time relevant to this matter, a "person within the meaning of 42 U.S.C. § 1983.

38.    Defendant Fraser is being sued in his official and/or individual capacity.

39.    Defendant Fraser last known principle place of business is or was 60 Hudson Street, New York, New York 10013

40.    Defendant Michael Caruso (herein after Caruso) was, at all times relevant hereto, the Inspector General of the New York City Department of Investigation ("DOI") with responsibility for the City Department of Corrections (DOC).

41.    Defendant Caruso was, at all times relevant hereto, a "person" within the meaning of 42 U.S.C. § 1983.

42.    Defendant Caruso is being sued in his official and/or individual capacity.

43.     Defendant Caruso's last known principle place of business is or was 60 Hudson Street, New York, New York 10013.

44.     Plaintiff sues the Defendants who are natural persons in both their individual and official capacities.

45.     In doing the acts alleged in this complaint, Defendants acted as agents for and on behalf of all other Defendants named in this complaint.

## CONDITIONS PRECEDENT

46.     On February 28, 2013 Plaintiff submitted a timely Notice of Claim via United States Postal Mail to the Office of the Comptroller of the City based on new information and evidence not previously known to Plaintiff and subsequently received a claim number 2013P1006910.

47.     Plaintiff learned of the new information and evidence following the course of the jury trail proceeding in the Oba Hassan Wat Bey case, which concluded in a unanimous jury verdict favorable to the Plaintiffs in that case on December 18, 2012.

48.     The Testimony of Terence Skinner (non-party witness) in the Oba Hassan Wat Bey Case is what initially gave rise to this claim as more fully set forth herein. See annexed herein, a copy of the Transcript of Terrence Skinner's testimony, dated December 10, 2012 at Exhibit A.

49.     The Honorable Alison J. Nathan, U.S. District Court Judge was the presiding Judge in the Oba Hassan Wat Bey case and her final amended judgment, the initial one of which is on appeal, was issued on November 5, 2013. see annexed herein a copy of Hon. Judge Alison J. Nathan's Amended Judgment, dated November. 5, 2013 at Exhibit B.

## GENERAL FACTUAL ALLEGATIONS

50.     On December 18, 2012 a unanimous jury verdict was handed down in the Oba Hassan Wat Bey case of this Court in favor of the Moorish American Plaintiffs who are or were Moorish

American former Corrections Officers against the Defendant City, Caruso and Kerik for among other things, discrimination, equal protection violation and denial of due process because of Plaintiffs being a Moor or Moorish American and for their Moorish American faith.

51.    At all time relevant hereto, Plaintiff herein is similarly situated with the Plaintiffs in the Oba Hassan Wat Bey, et. al. v. The City of New York, et. al (cite omitted) case with respect to this action and Plaintiff's prior civil actions that were filed in this court as they are inextricably intertwined, as the underlining factual circumstances are the same with essentially the same Defendants.

52.    The Plaintiff's prior civil actions related to the Oba Hassan Wat Bey case (cite omitted) are Jawan Akil Bey, et. al. v. City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) (dismissed/stipulation of dismissal); Shekhem El Bey vs The City of New York, et. al. 99 Civ 12490 (JES)(MHD)(defaulted/dismissed); Shekhem El Bey vs. City of New York, et. al. 00 Civ. 9260 (JES) (dismissed); and Shekhem El Bey, vs. City of New York, et. al. 05 Civ. 7072 (TPG) wherein the Honorable Thomas P. Griesa granted Plaintiff's request for withdrawal without prejudice to permit Plaintiff to re-file at a latter date. See annexed herein a copy of Hon. Thomas P. Griesa's Order dated April 19, 2006 at Exhibit C.

53.    At all time relevant hereto, Plaintiff's re-filed civil action with its statement of relatedness letter, filed under informa pauparis on November 13, 2006 subsequently went missing at the Pro Se's Office and never receive a full or fair adjudication of the claims therein.

54.    At all time relevant hereto, the pro se office staff was unable to locate Plaintiff's November 13, 2006 re-filed complaint and never received a civil complaint number.

55.    On or about August 2008, by United States postal mail, Plaintiff received from the City a Memorandum of law in opposition to plaintiff's alleged 60 (B) motion.

56.     At all time relevant hereto, Plaintiff did not prepare, filed or submit a 60 (B) motion to the Court or mailed any such copies to the City.

57.     At all time relevant hereto, Plaintiff discovered that Plaintiff's November 13, 2006 re-filed civil complaint with its statement of relatedness letter that went missing at the pro se office at 500 pearl street was found under document #44 under the already closed case - Shekhem El Bey. vs. City of New York, et. al. 00 Civ. 9260 (JES) (dismissed).

58.     The documents under document #44 only consisted of Plaintiff's November 13, 2006 re-filed civil complaint with the statement of relatedness letter and no 60 (B) motion.

59.     At all time relevant hereto, document #44 was and/or is not viewable online or on the intranet or internet system of the U.S. District Court for the Southern District of New York, but can only be physically viewed in Person at the Court upon request.

60.     At all time relevant, the City through its agents or its Attorneys committed mail fraud and fraud upon the Court when it mailed to the Plaintiff its opposition motion to Plaintiff's alleged 60 (b) motion when Plaintiff had not submitted a 60 (b) motion to be opposed in which case the opposition motion filed by the City was filed under fraud on the Court record and is public record.

61.     Attorney Ms. Irene Donna Thomas (herein after Ms. Thomas), of the Thomas Plaintiff's in the Oba Hassan Wat Bey case as distinguished from Plaintiffs represented by Attorney Mr. David M. Schlachter (Schlachter Plaintiffs), deposed on direct examination a former high ranking DOC official, Terence J. Skinner (herein after Skinner) (non-party witness), who provided un-refuted and uncontested testimony on December 10, 2012. See copy - Skinner's Transcript annexed herein at Exhibit A.

62.     Skinner (non-party witness) testified that he was a deputy warden, the Executive Officer to the Chief of Security.

63.     Skinner (non-party witness) testified that Defendant Fraser was his immediate superior and that Defendant Fraser was the Chief of the Department and Chief of Security.

64.     Skinner, testified that his "Responsibilities included overall security through out  the entire department".

65.     In response to Ms. Thomas question "...did you have any responsibilities in connection with the gang intelligence unit?" Skinner testified "Yes. The chief of security's office oversaw the gang intelligence unit".

66.     Skinner, testified that he was in charge of the Gang Intelligence Unit for DOC.

67.     In response to Ms. Thomas question "...was the Gang Intelligence Unit ever used for a purpose other than its original intent?" In reply, Skinner testified that "One time, at some point in 1998 between August and December of 1998".

68.     In response to Ms. Thomas question "and what happen at that time?" In reply, Skinner, testified "We were instructed by the Inspector General, Mike Caruso, to have the gang intelligence unit conduct video surveillance of a protest at 60 Hudson Street".

69.     In response to Ms. Thomas question "And was there a meeting held to plan the surveillance?" In reply, Skinner, testified "Initially there was a meeting between myself, Chief Fraser, Commissioner Kerik, and his chief of staff, John Piciano. And at that meeting we were instructed that Mike Caruso would contact us and that we should do what he needed us to do regarding our surveillance of the demonstration that was going to take place".

70.     In response to Ms. Thomas question "And what was the concern that was raised at that meeting concerning the surveillance activity?" In reply, Skinner, testified **"The Commissioner indicated that the mayor had held a press conference and indicated that these people were going to be fired for the actions that they had taken** and that this was an important issue, so we

should do what was necessary to assist the Inspector General's Office in trying to gather information against this group".

71.    In response to Ms. Thomas question "And what group were you referring to, Sir?" In reply, Skinner, testified "**They were referred to as the Moors**".

72.    Skinner, testified that "the Gang Intelligence Unit did do video surveillance of the demonstration...".

73.    Plaintiff herein was not present on the day that Skinner gave testimony and only learned of his testimony through Ntchwaidumela Bey (non-party witness) who attended most or all of the trail hearing and deliberations of the Oba Hassan Wat Bey trail proceedings.

74.    The transcripts of the proceedings was made available and became record on the court 2 to 3 months later, on or about March or April 2013 through which Plaintiff was able to confirm the conspiracy, fraud and retaliation.

75.    At all time relevant hereto, the testimony of Skinner revealed that between August and December of 1998 Defendant Kerik held a DOC meeting in which Kerik communicated that "those people are going to be fired...".

76.    At all time relevant hereto, according to Skinner's testimony, Defendant Kerik was referring to Moors within the Department of Correction and that there was a press conference held by Defendant Giuliani regarding Moors to which evidence was produced at trial proving this fact by Ms. Thomas, Attorney for the Plaintiffs in the Oba Hassan Wat Bey case.

77.    According to Skinner's testimony, Defendant Kerik also communicated that Defendant Caruso will contact everyone who was at the DOC meeting to coordinate surveillance efforts on the Moors in regards to a planned demonstration at 60 Hudson Street.

78.     Plaintiff was not privy to such information or evidence made available to Plaintiff during Plaintiff's prior civil actions that commenced as far back as 1998.

79.     Plaintiff was not aware of any covert operations targeting Moorish American Correction Officers for discharge or termination of employment that was carried out by Defendant Kerik and Caruso.

80.     At all time relevant hereto, the covert surveillance operation for the plan demonstration  was carried out in secret.

81.     At all time relevant hereto, Defendant Giuliani, Kerik, Caruso and Rose Luttan Rubin (non-party in this action), were named Defendants in Plaintiff's prior lawsuit in Jawan Akil Bey, et. al. v. City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) that was filed February 24, 1998 approximately 6 or 10 months before the closed door meeting that was had with Defendant Kerik and Defendant Fraser, along with Picciano (non-party) and Skinner (non-party witness).

82.     At all time relevant hereto, Defendant Giuliani and Caruso were named Defendants in another prior action in which Plaintiff was not a party, however, the actions were by Moorish American Correction officers in Jawan Akil Bey, et. al. v. State of New York, et. al. 97 Civ. 9057 (LAK) that was filed December 9, 1997, approximately 9 or 14 months before the closed door meeting that was had with Defendant Kerik and Defendant Fraser, along with Picciano (non-party) and Skinner (non-party witness).

83.     At all time relevant hereto, Defendant Kerik, Fraser and Caruso actions and conduct relative to the DOC meeting held behind closed doors on or about August and December of 1998 in connection with the Giuliani Press Conference regarding the "Moors" and with the "meeting of the minds", was in part or in whole, an elaborate conspiracy for the purpose and intent of discharging

Moors or Moorish Americans from DOC employment for filing civil complaints and/or submission of Moorish American documents adopting the Moorish American faith.

84.    At all time relevant hereto, the conspiracy was for the purpose of depriving Plaintiff of the equal protection of the laws because of being a Moor or  Moorish American and/or Moorish faith.

85.    At all time relevant hereto, the conspiracy was for the purpose of depriving Plaintiff of the equal protection of the laws because of having filed a civil action against Defendant Giuliani, Kerik and Caruso.

86.    At all time relevant hereto, Defendant Kerik did in fact discharged Plaintiff, as did the Plaintiffs in the Oba Hassan Wat Bey.

87.    At all time relevant hereto, Defendant Kerik carried out what he had indicated at the closed door meeting that **"these people were going to be fired for the actions that they had taken..."** .

88.    At all time relevant hereto, Defendants in furtherance of their conspiracy subjected Plaintiff to summary suspension in excess of 30 days following an almost 2 year involuntary medical leave of absence when its only suppose to be up to at most 1 year, modified duty in an asbestos contaminated facility, an administrative tribunal that was subjected to inappropriate influence from Giuliani and Defendant Caruso, and subsequently discharged Plaintiff  from employment, as were the Plaintiffs in the Oba Hassan Wat Bey case.

89.    At all time relevant hereto, all evidence provided in the Oba Hasan Wat Bey case has relevance to Plaintiff's claim in this action.

90.    Plaintiff is similarly situated as those Moorish American former Correction Officers in the Oba Hassan Wat Bey Case, who as the record and evidence showed in the Oba Hassan Wat Bey case, were singled out to be discharged from employment because of being a Moor and/or Moorish American and/or Moorish faith.

91.     Plaintiff was also singled out to be discharged from employment in retaliation for having filed civil lawsuits against Defendants herein.

92.     Plaintiff was also singled out to be discharged from employment because of submitting documents proclaiming Nationality as a Moorish American and/or Moor.

93.     Plaintiff was also singled out to be discharged from employment because of submitting documents proclaiming his Moorish American faith.

94.     At all time relevant hereto, Defendants Giuliani, Kerik, Caruso and Fraser had and/or has an invidious discriminatory animus against Plaintiff because of being a Moor and/or Moorish American as were the Plaintiffs in the Oba Hassan Wat Bey case.

95.     At all time relevant hereto, Defendants Giuliani, Kerik, Caruso and Fraser had and/or has an invidious discriminatory animus against Plaintiff because of being of the Moorish American faith or in association with the Moorish faith, as were the Plaintiffs in the Oba Hassan Wat Bey case.

96.     At all time relevant hereto, Plaintiff, as a proximate and/or direct result, suffered injury and/or damages to his property interest in employment and deprived of his rights as a Citizen of the United States of America.

97.     At all time relevant hereto, as a proximate and/or direct result, Plaintiff suffered damages and experienced extreme emotional distress, loss of employment and benefits with DOC, loss of enjoyment and quality of life, anxiety, depression, loss of reputation, embarrassment, humiliation and carrying the stigma of being a "black separatist" terrorist criminal when identified as Moor or Moorish American, loss of pension, loss of opportunity to obtain any government employment, and is undergoing ongoing medical counseling and treatment at the Veterans Administration Hospital at the James J. Peters Medical Center in the Bronx.

98.    At all time relevant hereto, according to Mr. Skinner's testimony, present at the meeting beside himself was Defendant Kerik, Fraser and John Piciano (non-party).

99.    At all times relevant herein, defendant Caruso was responsible for investigating charges of misconduct by DOC employees, as was established on the record of the Oba Hassan Wat Bey case.

100.    Rule 3.20.03 of the Departmental Rules and Regulations provide that DOC employees who make false official statements and who are convicted in a court of criminal jurisdiction have engaged in conduct of comparable seriousness.

101.    Rule 3.20.03 applies to all DOC employees.

102.    The rule prohibiting submission of false tax documents to the DOC applies to all DOC employees.

103.    All DOC employees are subject to the same standards of conduct and evaluation.

104.    For discipline purposes, it is irrelevant if DOC employees who submitted false tax documents to the Department filed all tax returns and paid all taxes.

105.    All DOC employees were investigated under the same "99 exemption" tax investigation, as was established on the record of the Oba Hassan Wat Bey case.

106.    Defendant Caruso is responsible for maintaining standards of conduct for all DOC employees, as was established on the record of the Oba Hassan Wat Bey case.

107.    On or about Mid-1995, Plaintiff adopted the Moorish American faith.

108.    Plaintiff chose to manifest his religious observance and national identity through the name he used to present himself before the public and GOD (NEB ER TCHER - YHWH - ALLAH).

109.    Plaintiff adopted the Moorish Title El and Bey.

110.    Plaintiff changed his entire name from James Dennis Mercer to Yashua Amen Shekhem El Bey.

111.    Plaintiff exercised his fundamental human rights when he presented his name change by proclaiming his nationality as Moorish American pursuant to Article 15 of the Universal Declaration of Human Rights.

112.    Plaintiff notified defendants that he adopted  the Moorish American faith and informed defendants, in good faith, of the rights he honestly believed he possessed as Moorish American.

113.    Plaintiff submitted some or all of the following forms to DOC relating to Moorish American faith and nationality name claim: Moorish Zodiac Constitution, Letter of Credence-Notification of Rights and Immunities, Legal Notice-Declaration of Status and Name Claim.

114.    On or about 1993, Plaintiff, who at the time was under the name James D. Mercer, submitted tax forms to the DOC claiming tax exempt status.

115.    The tax forms submitted by Plaintiff in 1993 consisted of a Certificate of Exemption from withholding in lieu of a W-4 form, Laws Pertaining to Form W-4 and Employer Options.

116.    Plaintiff's submission of these documents in 1993 to the DOC did not generate disruption in the work place and no fair warnings were made that said documents could subject Plaintiff to disciplinary charges.

117.    Plaintiff's submission of these documents did not impede the general operation of the DOC.

118.    Plaintiff's submission of these documents did not adversely affect the working relationships between Plaintiff's superiors necessary to the proper functioning of the DOC.

119.    DOC employees who did not claim to be Moors submitted the same or substantially similar tax documents to those submitted by Plaintiff in 1993 when Plaintiff had not yet claimed to be Moorish American.

120.    On or about April 10, 1996, the New York City DOI, under the direction of Defendant Caruso, began an investigation called "99 exemptions" to investigate all employees of DOC who

had claimed between 40 or more exemptions on their federal and state tax forms submitted to the DOC, the facts of which is established on the record of the Oba Hassan Wat Be case.

121.   Defendant Caruso determined that these documents constituted "false tax documents"

122.   On or about June 18, 1996, Defendant Caruso received a printout from the Office of Personnel Administration for the DOC listing all DOC employees who had filed 40 or more exemptions. Eliminating all duplicates, this list contained the names of 780 DOC employees who had filed 40 or more exemptions. During the investigation , Defendant Caruso learned that an additional 748 employees had submitted false tax documents with DOC.

123.   Defendant Caruso submitted this list to the Manhattan District Attorney's Office and the New York State Attorney General's (A.G.'s) Office.

124.   The Manhattan District Attorney's Office and the New York State Attorney Generals office told Defendant Caruso which DOC employees should be arrested.

125.   During the investigation, DOI officials nor DOC officials advised Plaintiff that he is under investigation.

126.   Plaintiff was not arrested.

127.   Defendant Caruso learned that Defendant Kerik's lover, Jeanette Pinero and Kerik's "right hand man", John Picciano submitted false tax documents to the DOC.

128.   On or about July 12, 1996, Defendant Caruso received and read a memorandum from the New York City Police Department (NYPD) claiming, among other things, that an individual involved in a "car stop" was a member of a group known as "The Great Seal Association of Moorish Affairs" and that members of that group had been previously arrested and were suspected of armed robberies and trafficking in high-powered automatic weapons, and this fact was presented

as new information and exculpatory evidence in case Shekhem El Bey, vs. City of New York, et. al. 05 Civ. 7072 (TPG).

129.    Plaintiff was not identified in the NYPD memorandum as having engaged in the conduct addressed.

130.    Plaintiff was never accused of being suspected of "armed robberies" and "trafficking in high-powered automatic weapons".

131.    The NYPD memorandum did not identify the individual involved in the "car stop" as a DOC Corrections Officer.

132.    Plaintiff's only connection to the NYPD memorandum was his status as a member of the "Moorish Nation" and his association with the Great Seal of Moorish American Affairs.

133.    During the "99 exemptions" investigation, Defendant Caruso and/or employees under his supervision, compiled a list of DOC employees who he/they identified as Moors and/or Moorish Americans.

134.    During the tax investigation, approximately 29 DOC employees were wiretapped.

135.    At all time relevant hereto, upon information and belief, one of those wiretapped was Plaintiff herein.

136.    During the tax investigation, informants were used in covert undercover surveillance operations to attend meetings of the Moorish faith to obtain information.

137.    The DOI's investigation lasted 18 months.

138.    After the conclusion of the 18 month investigation, Defendant Caruso made recommendation to the DOC for the initiation of disciplinary charges against certain DOC employees who filed false tax documents.

139.    Of those employees who were not arrested and criminally charged, on or about December 3, 1997 and on June14, 1999 Defendant Caruso recommended that 21 DOC employees and Plaintiff, respectively, identified as Moorish American, be summarily suspended.

140.    Plaintiff herein, as were the Plaintiff in the Oba Hassan Wat Bey Case, was merely informed that they were being summarily suspended because they supplied the DOC with tax forms which contained false information.

141.    Defendant Caruso targeted Moorish Americans, including Plaintiff, for adverse treatment because Moors were a "security concern" because (1) they were affiliated with the "Moorish National " group, (2) because of documents they submitted to the DOC announcing their religious philosophy and nationality as Moorish American, and (3) because of having filed Federal lawsuits against Defendant Giuliani, Kerik, Caruso, and others.

142.    On June 14, 1999, Plaintiff was summarily suspended without pay for submission of false tax documents that was submitted back in on or about December  of 1993.

143.    Before ordering Plaintiff's summary suspension, Defendant Caruso did not interview Plaintiff nor any other manner give Plaintiff notice that the NYPD memorandum was the basis for his adverse treatment nor were Plaintiff given an opportunity to be heard on this reason for the summary suspension.

144.    Following Plaintiff's return from an almost 2 year unpaid involuntary medical leave from DOC, within 20 minutes of reporting to DOC on June 14, 1999, Plaintiff, rather than being reinstated to full duty, was instead placed on summary suspension without pay for over 30 days and subsequently placed on modified duty in an asbestos contaminated facility at the Brooklyn Correctional facility (BCF), which gave rise to the civil case in Shekhem El Bey vs The City of New York, et. al. 99 Civ 12490 (JES)(MHD)(defaulted/dismissed).

145.    On or about early December 1997, Giuliani referred to Plaintiff's religious beliefs as a "scheme" and referred to the "Moorish National" group as a "cult", the facts of which was established on the record of the Oba Hassan Wat Bey case.

146.    At all time relevant hereto, on or about 1997 Defendant Giuliani publicly announced, prior to the holding of administrative hearings, that all employees charged with failing to file state and city income tax returns and who had been suspended "would almost certainly lose their jobs after disciplinary proceedings against theme were completed". This speech did not mentioned Moors.

147.    On or about December 8, 1997, Edward Kuriansky (herein after Kuriansky-non-party herein), Commissioner of the New York City Department of Investigation, publicly announced that Plaintiff's Moorish American religious philosophy "is extremely offensive and serious conduct" and further stated that "for a sworn law enforcement officer, who carries a gun, who have taken an oath to the United States and the state constitution, and for all other purposes claims the benefits of citizenship, who has the gall not to pay his fair share - I mean it's really outrageous".

148.    Kuriansky made these statements with full knowledge that DOC employees, law enforcement officers, who did not claim to be Moors, submitted false tax documents to the Department claiming either "99" exemptions or to be tax exempt and who also submitted documents to the Department claiming that they were not subject to the jurisdiction of the United States and/or the State of New York. This fact was established in the Oba Hassan Wat Bey case.

149.    In early February 1998, the World Service Authority contacted Defendant Caruso and advised Caruso that use of the name "Bey" was an effort to assert the right to change nationality and to manifest religious observance, and that this right was being violated by DOC.

150.    On or about 1998, Defendant Caruso issued a Memorandum of Complaint to the DOC recommending that individuals who are Moorish American as referenced in the Oba Hassan Wat

Bey case be terminated because they submitted false tax instruments to the DOC and engaged in conduct unbecoming an officer or member of the Department.

151.    On or about 1999, Defendant Caruso issued a Memorandum of Complaint to the DOC recommending that Plaintiff who is Moorish American be terminated because he submitted false tax instruments to the DOC and engaged in conduct unbecoming an officer or member of the Department.

152.    On July 22, 1999, Plaintiff was placed on modified duty assignment under horrific and filthy working conditions in an asbestos contaminated facility in Brooklyn at BCF, isolated from inmates and co-workers.

153.    While on modified duty assignment, Plaintiff was not permitted to possess, carry or purchase a personal firearm, be assigned to any duties requiring the possession, handling, maintenance or security of departmental firearms, chemical agents or funds, and Plaintiff had no responsibility and supervision of care, custody and control of incarcerated inmates, among other things.

154.    Before being placed on modified duty, Defendant Caruso, nor any other officials from the DOI informed Plaintiff that he had been targeted for modified duty because he was deemed to raise "security concerns" because of his association or affiliation with the Moorish National group.

155.    Before issuing the memorandum of complaint, Defendant Caruso did not interview Plaintiff nor in any other manner given notice that the NYPD memorandum was the basis for his adverse treatment nor were Plaintiff given an opportunity to be heard on this reason for his proposed termination.

156.    On or about August 25, 1998, while Plaintiff was on involuntary unpaid medical leave, the DOC Trials Division drafted and served Plaintiff via the United States Postal service Charges and

Specifications charging Plaintiff with submitting false instruments concerning taxes to the Department and with violating his oath of office.

157. Defendant Caruso did not summarily suspend DOC employees who did not claim to be Moors but who also submitted false tax documents to the Department.

158. On or about November 3, 1999, at the pre-trail hearing Plaintiff was offered the choice of resignation without the possibility of obtaining any other city government job or termination. Plaintiff accepted neither.

159. At all time relevant hereto, Defendant Caruso requested Plaintiff's summary suspension following his return from an unpaid involuntary medical leave.

160. On or about March 14, 2000, the ALJ Tompkins (herein after ALJ - non-party) issued a Report and Recommendation in connection with the charges and specifications.

161. At no time did the ALJ mentioned in the Report and Recommendation Plaintiff's objections and pending federal cases against the City and Giuliani.

162. The ALJ made a determination of federal tax law regarding the submission of an in lieu of W-4 form and factual finding that Plaintiff violated federal tax law 26 U.S.C. § 7205 and committed a crime under New York State penal law, as was done against the Plaintiff in the Oba Hassan Wat Bey Case by another ALJ.

163. On or about April 27, 2000, Defendant Kerik adopted the ALJ's report and recommendation, which excluded Plaintiff's objections and noticing of pending federal civil actions.

164. That day, Defendant Kerik imposed the sanction of discharge for submitting false tax documents to the DOC, as he had done against the Plaintiffs in the Oba Hassan Wat Bey case.

165. Defendant Kerik was not required to adopt the ALJ's recommendation for Plaintiff discharge and had considerable authority and discretion to impose a different sanction.

166.    For many years prior to Plaintiff's summary suspension, modified duty placement from a suspension and ultimate discharge, Defendants tolerated the practice of employees claiming excessive exemptions or claiming tax exempt status without objection and without advising or providing fair warning to employees that their conduct could lead to disciplinary or criminal action.

167.    DOC employees who submitted false tax documents to the Department but who did not claim to be Moorish Americans were not subject to the same adverse treatment as the Moorish Americans.

168.    White DOC employees who submitted false tax documents to the Department were not subject to the same adverse treatment as the Moorish Americans.

169.    Plaintiff's almost 2 year unpaid involuntary medical leave followed by an unpaid summary suspension in excess of 30 days, which began on June 14, 1999, modified duty in an asbestos contaminated facility at BCF until Plaintiff's discharged from DOC, was intentional, deliberate, malicious and in conspiracy by Defendants to discharge Plaintiff from employment on April 27, 2000 because of being Moorish American and/or of the Moorish faith and/or in retaliation for having filed federal lawsuits against Defendants in 1998.

170     On May 27, 1999, Oba Hassan Wat Bey (Robert Watson) and five other discharged Moorish American employees filed a civil action in the Southern District of New York, 99 Civ. 3873, protesting their discharge as unconstitutional.

171.    On or about May of 2000, Plaintiff filed a civil action in the Southern District of New York, 00 Civ 9260 (JES), protesting his discharge as unconstitutional.

172.    On February 4, 2000, the DOC legal Division contacted its investigation and trials unit to determine whether similar charges of misconduct, i.e. filing false tax documents, had been brought against DOC employees who did not claim to be Moors.

173.    On March 16, 2000, Josephine Pradegan, Caruso's immediate subordinate, gave the Legal Division a list of 10 DOC employees who did not claim to be Moors against whom similar charges of filing false tax documents had been filed.

174.    Virtually all employees on that list had been selected for arrest by state and federal authorities and were not in the same category with Plaintiff and other Moors similarly situated.

175.    Beginning on or about January 30, 2001, Defendant Caruso submitted a memorandum and complaint to the DOC for about 117 DOC employees who submitted the same or substantially similar documents to the DOC as those submitted by Moorish Americans.

176.    Defendant Caruso recommended that disciplinary action against most of these individuals be deferred.

177.    These employees, the DOC employees who submitted false tax documents to the DOC, but who did not claim to be Moors, were never discipline and evidence was produced on the record of the Oba Hassan Wat Bey case.

178.    On or about August 17, 2005, Plaintiff filed civil action, Shekhem El Bey, vs. City of New York, et. al. 05 Civ. 7270, based on what was then new information learned for the first time that Defendant Caruso selected Plaintiff for summary suspension, modified duty placement and recommended discharge because Defendant Caruso determined that Plaintiff because of being a Moor is a potential security concern due to Defendant Caruso's receipt of the NYPD memorandum and Plaintiff's affiliation with the "Moorish National" group.

179.    Defendants Caruso, and each of the other Defendants concealed the true nature of the charges against Plaintiff, as were the Plaintiffs in the Oba Hassan Wat Bey case.

180.    Between 1996 and April 27, 2000, Defendant Caruso did not order the summary suspension and modified duty assignment for any white DOC employees who submitted the same or

substantially similar documents as those submitted by Plaintiff and the Moorish Americans CO's, including, but not limited to: John Sheridan, Carlo Pannizzo, John Russo, D. Ryan, D. Sabatano, James Salvio, George Sheehy, Nicholas Varounis, Jr., P. Venechanos, Joseph Vicenzo, Richard Weiss, and evidence was produced on the record of the Oba Hassan Wat Bey case.

181.    During the tax investigation, Defendant Caruso kept various lists of identified Moors who were DOC employees.

182.    Plaintiff is one of those Moors listed and evidence was produced on the record of the Oha Hassan Wat Bey case.

183.    Defendant Caruso did not recommend summary suspension, modified duty or discharge for Defendant Kerik's lover, Jeannette Pinero or his "right hand man", John Picciano despite his knowledge that they submitted false tax documents to DOC, and evidence of this fact was produced on the record of the Oba Hassan Wat Bey case.

184.    Defendants claim that they were justified in summarily suspending, ordering modified duty and terminating Plaintiff's employment, and the employment of all other Moorish Americans DOC employees, only because Plaintiff and they are a security concern due to his and their affiliation with the Moorish National Group, and evidence to that effect was produced on the record of the Oba Hassan Wat Bey case.

185.    Defendants did not identify and target for adverse employment treatment members of other religious groups for engaging in the same or substantially similar conduct as Plaintiff herein and the Plaintiffs in the Oba Hassan Wat Bey case.

186.    Defendant Kerik and Caruso in furtherance of their conspiracy in corroborating their efforts, individually and collectively, and in support by their subordinates, by implementing a systemic policy, custom and/or practice aimed at targeting Moorish Americans for adverse employment

treatment and action because of Plaintiff's religious beliefs, speech on matters of public concern, and in retaliation for filing federal lawsuits and/or submission of Moorish American documents.

187.    Defendant Kerik and Caruso in furtherance of their conspiracy, by selectively enforcing DOC rules and regulations against employees identified as Moorish Americans because of race, religion or national origin, Plaintiff's association or affiliation with the "Moorish group" and/or the Great Seal of Moorish American Affairs.

188.    Defendant Caruso and Kerik violated Plaintiff's fundamental human rights and constitutional rights to freedom of speech, freedom of association and from discrimination, equal protection of the law and due process of law because of Plaintiff being a Moor or Moorish American.

189.    Defendant Giuliani abused his office when it was communicated through Defendant Kerik at the closed door meeting between August and December 1998 that **"these people were going to be fired for the actions that they had taken",** referring to the Moors in connection to a press conference held by Defendant Giuliani regarding the Moors.

190.    Defendant Giuliani violated his Oath of office when by his own conduct working through Defendant Kerik and Caruso nullified the independence and integrity of OATH subjecting it to inappropriate influence, denying Plaintiff due process of law, as did the Plaintiffs in the Oha Hassan Wat Bey case.

191.    The conduct of OATH was at all time relevant hereto, at the direction of the Mayor, as it was used as a "rubber stamp" to legitimize Defendant Kerik's discharge of the Moorish American Correction Officers.

192.    By failing to remedy Defendant Caruso's, inhuman and unconstitutional wrongs against Plaintiff, by allowing and/or permitting Defendant Caruso's systemic policy, customs or practice aimed at targeting Moorish Americans for adverse employment actions to continue, by failing or refusing to order the DOC's Investigation and Trails Unit to conduct an unbiased independent investigation of the basis of the charges and specifications against Plaintiff and by being negligent

in managing Defendant Caruso and DOC subordinates who caused and/or substantially contributed to the unconstitutional deprivations and human rights abuse visited upon Plaintiff, as were the Plaintiff's in the Oba Hassan Wat Bey case is the proximate and/or direct cause of Plaintiff damages set forth herein.

193. At all time relevant hereto, pursuant to Article 62 of the Civil Service Law of the State of New York, Defendant Giuliani, Kerik, Caruso and Fraser sworn or affirmed an oath to uphold the Constitution of the United States and the Constitution of the State of New York.

194. At all time relevant hereto, Defendant Giuliani, Kerik, Caruso and Fraser, new or should have reasonably known that their conduct in targeting Plaintiff, as were the Plaintiffs in the Oba Hassan Wat Bey case, for adverse employment action and discharge because of being a Moor or Moorish American or associated as a Moor or Moorish American violates their Oath of office in their respective position of influence and authority.

195. Defendant Kerik violated Plaintiff's fundamental human rights and constitutional rights to freedom of speech, freedom of association and from discrimination, equal protection of the law and due process of law.

196. Defendant Caruso violated Plaintiff's fundamental human rights and constitutional rights Freedom of Association, freedom of speech, freedom of association from discrimination, equal protection of the law and due process of law.

197. On December 18, 2012, the reading of the Jury verdict was announced, which was unanimous, and that it was found by a preponderance of the evidence that the motivating factor for the adverse employment action against those Plaintiffs, to whom Plaintiff herein is similarly situated in all respects, is because of being Moorish American or Moor, among other things, to include Religion, freedom of Association, discrimination, denial of equal protection, and denial of due process and 42 U.S.C. § 1983 claims, as set forth in the Jury verdict.

198.     At all time relevant hereto, the conduct of the OATH proceedings was compromised  by

Giuliani in which Plaintiff, and those similarly situated was denied due process of law.

199.     At all times relevant, Defendant Giuliani acted under color state law in using his political

power and position to influence the conduct of OATH in carrying out his intentions to discharge

Moors from employment, as Plaintiff herein and the Plaintiffs in the Oba Hassan Wat Bey case.

200.     At all time relevant hereto, OATH's impartiality was and/or is compromised by the City's

pecuniary interest in which it becomes enriched in the imposition of economic penalties, i.e.

termination or discharge from city employment and lost of pension following the recommendation

of the ALJ for city officials as was Defendant Kerik when he discharged Plaintiff employment with

DOC, as he did with the Plaintiffs in the Oba Hassan Wat Bey case.

201.     At all time relevant hereto, OATH, an agency or department of the City of New York, was

merely used as a "rubber stamp" by Defendant Giuliani through Kerik to discharge or terminate

Plaintiff's employment, as was the Plaintiffs in the Oba Hassan Wat Bey case because of being a

Moor or Moorish American.

202.     At all times relevant hereto, the OATH proceedings deprived Plaintiff as did the Plaintiff's in

the Oba Hasan Wat Bey case of due process of law because OATH was subjected to the undue

influence of Defendant Giuliani in which it was indicated by Defendant Kerik at a closed door

meeting in 1998 that " **these people were going to be fired for the actions that they had taken"**

and "**They were referred to as the Moors**".

203.     By promulgating, executing and/or implementing in a conspiracy and retaliation, a policy,

custom, practice, statement, ordinance, or regulation or by adopting  and/or ratifying a decision

promulgated DOI policy-making officials to target all DOC employees of the Moorish American

faith for adverse employment actions leading up to termination of employment although DOC

employees who did not claim to be Moors engaged in the same or substantially similar misconduct did not suffer the same adverse employment action as the Moorish American Correction Officers.

204.    By promulgating, executing and/or implementing in a conspiracy and in retaliation, a policy, custom, practice, in violation of Plaintiff's and similarly situated DOC employees fundamental human rights and constitutional rights to freedom of speech, freedom of association and from discrimination, equal protection of the law and due process of law, DOI officials regularly attended and participated in "leadership" meetings with then-Mayor Giuliani to keep the Mayor informed of all investigations  and where Giuliani approved of the investigation leading to Plaintiff's discharge and those Plaintiffs in the Oba Hassan Wat Bey case.

205.    Defendant Giuliani made announcements in the media approving of the investigation and the discharge of Moorish Americans, although DOC employees who did not claim to be Moors engaged in the same or substantially similar misconduct and were not discharged from employment, Defendant City violated Plaintiff's fundamental human rights and Constitutional Rights.

206.    As a legal and proximate and/or direct result of Defendant Giuliani, Kerik's, Caruso, and other co-conspirators not yet or should be named herein, violated clearly established law.

207.    Plaintiff have suffered and continues to suffer substantial losses, including the loss of past and future earnings, promotional opportunities, bonuses, deferred compensation, overtime, night differential and other fringe benefits;

208.    Plaintiff has suffered and continue to suffer impairment and damage to his good name and reputation; Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, emotional distress, loss of enjoyment and quality of life, loss of reputation, the stigma of being a "black separatist" terrorist because of being a Moor or Moorish American and other incidental and consequential damages and expenses.

209.    The conduct of Defendants shocks the conscience, were outrageous, inhumane, vicious and malicious, was intended and for the purpose to, and in fact, injured and/or damaged Plaintiff and was flagrantly done with reckless and depraved indifference to Plaintiff's fundamental human, constitutional and civil rights, entitling Plaintiff to an award of equitable, ancillary and declaratory relief against the individual Defendants.

### COUNT I
### (42 U.S.C. § 1985 (3) - Conspiracy)

210.    Plaintiff repeat and reallege paragraph 1 through 209 above with the same force and effect as if set forth herein.

211.    By engaging in a policy, custom and/or practice of targeting Moorish Americans for adverse treatment, Defendant Kerik, Caruso, Fraser, with the "meeting of the minds" conspired covertly behind closed doors and selectively targeted Moorish Americans to which Plaintiff has been identified for adverse employment actions, including but not limited to, an almost 2 year unpaid involuntary medical leave, excessive summary suspension, modified duty in an asbestos contaminated facility and subsequent discharge from employment, for the intent and purpose of denying Plaintiff the equal protection under the law, and utilizing OATH as a "rubber stamp" as part of their conspiracy and as a mechanism and tool with which to facilitate Plaintiff's discharge from City employment, as OATH was subjected to the inappropriate influences of Defendant Giuliani.

212.    As a proximate and/or direct result of Defendants actions stated herein, Plaintiff is injured and/or damaged in his property interest and denied the right to the equal protection under the law, to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction

Officer and subsequent full retirement benefits and pension as Captain and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

**COUNT II**
**(42 U.S.C. § 1986 - Neglect to Prevent Conspiracy)**

213.    Plaintiff repeat and reallege paragraph 1 through 212 above with the same force and effect as if set forth herein.

214.    Defendants, individually and collectively, knew or should have reasonably known of their wrongs conspired to be done to Plaintiff and those similarly situated because of being a Moor or Moorish American or of the Moorish American faith, and having power to prevent or aid in preventing the commission of  same, neglected or refused so to do when Defendants and each of them by reasonable diligence could have prevented.

215.    As a proximate and/or direct result, Plaintiff suffered damages to which Plaintiff is entitled to equitable and anciliary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

**COUNT III**
**(42 U.S.C. § 1981 - Discrimination)**

216.    Plaintiff repeat and reallege paragraph 1 through 215 above with the same force and effect as if set forth herein.

217.    Plaintiff is a Moor or Moorish American who adopted the Moorish American faith.

218.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment due solely to Plaintiff association with Moorish American faith and religion,

Defendants violated Plaintiff's rights to be free from race and religious discrimination to which Plaintiff is entitled to equitable and ancillary relief as a matter of law.

219    DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged as was Plaintiff herein, as were the Plaintiff in the Oba Hassan Wat Bey case.

220.    Plaintiff's race and religion was at least a motivating factor in his discharge.

221.    As a proximate and/or direct result, Defendants conduct and actions has caused Plaintiff to suffer damages to which Plaintiff is entitled to the same or similar relief as set forth in the Oba Hassan Wat Bey case, but not limited thereto, as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT IV
### (42 U.S.C. § 1983 - Due Process)

222.    Plaintiff repeat and reallege paragraph 1 through 221 above with the same force and effect as if set forth herein.

223.    By intentionally and willfully concealing the true nature of the charges against Plaintiff, and in conspiracy and in retaliation thereof wherein lies the fraud, targeting Moorish Americans for termination of employment and utilizing OATH as a "rubber stamp" and subjecting it to inappropriate influences, acted "under color of statute, ordinance, regulation, custom, or usage, of the State or Territory of New York, and acted under color of state law" Defendants engaged in a policy, custom and/or practice to deprive Plaintiff of due process of law, i.e., the right to adequate

notice and an opportunity to be heard before an impartial fact finder on the actual charges against Plaintiff before a deprivation of a property interest in his employment, in violation of the due process clause of the 14th Amendment to the United States Constitution. to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

224.    As a proximate and/or direct result, by engaging in a, policy, custom and practice of targeting Moorish Americans for adverse treatment and termination or discharge from employment, Defendant Giuliani, Kerik, Caruso and Fraser, and each of them and collectively and through their subordinates violated Plaintiffs rights to due process of law pursuant to the due process clause of the 14th Amendment to the U.S. Constitution.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

**COUNT V**
**(42 U.S.C. § 1983 - Equal Protection- Selective Enforcement & Prosecution)**

225.    Plaintiff repeat and reallege paragraph 1 through 224 above with the same force and effect as if set forth herein.

226.    By Selectively subjecting  Plaintiff as were other Moorish Americans in DOC and those by association, for adverse employment actions compared with other similarly situated, where the selective treatment was based on race and/or religion, the intent to inhibit the exercise of constitutional rights and a malicious or bad faith intent to injure Plaintiff, as those Plaintiff in the Oba Hassan Wat Bey case, Defendants engaged in a policy, custom and/or practice to violate Plaintiffs  rights to equal protection of the law

227.    As a proximate and/o direct result, Plaintiff suffered damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT VI
### (42 USC § 1983 - Freedom of Association)

228.    Plaintiff repeat and reallege paragraph 1 through 227 above with the same force and effect as if set forth herein.

229.    By imposing an almost 2 year involuntary unpaid medical leave, summarily suspending Plaintiff, ordering Plaintiff's modified duty placement in an asbestos contaminated facility and recommending Plaintiff for termination, and in fact discharging Plaintiff, and treating Plaintiff as a "security concern" for no reason other than the fact that Plaintiff is affiliated with the "Moorish National group" identified in an NYPD memorandum and because Plaintiff submitted documents to the DOC announcing his nationality and religious philosophy, the Defendants engaged in a policy, custom and/or practice to violated Plaintiff's First Amendment right to freedom of association as purview through the 14th Amendment to the United States Constitution.

230.    As a proximate and/or direct result, Plaintiff suffered damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT VII
### (42 USC § 1983 - Freedom of Speech)

231.    Plaintiff repeat and reallege paragraph 1 through 230 above with the same force and effect as if set forth herein.

232.    By basing their decision to summarily suspend, place on modified duty in a asbestos contaminated facility and terminate Plaintiff on the content of his speech, filing federal lawsuits, documents submitted to the DOC on a matter of public concern, professing adoption of the Moorish American faith and Plaintiff's rights and immunity(ies) as a member of that religious faith, pursuant to the DOC's policy prohibiting discrimination on the basis of religion, Defendant engaged in a policy, custom and/or practice to violated Plaintiff right to freedom of speech.

233.    As a proximate and/or direct result, Plaintiff suffered damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT VIII
### (NYS - Selective Prosecution)

234.    Plaintiff repeat and reallege paragraph 1 through 233 above with the same force and effect as if set forth herein.

235.    By Selectively subjecting  Plaintiff, Moorish Americans, and other Moorish Americans, for adverse employment actions compared with other similarly situated, where the selective treatment was based on race, religion, the intent to inhibit the exercise of constitutional rights and a malicious or bad faith intent to injure Plaintiff, as those Plaintiff in the Oba Hassan Wat Bey case, Defendants

engaged in a policy, custom and/or practice to violate Plaintiff's rights under New York State law for Selective Prosecution.

236.   As a proximate and/or direct result, Plaintiff suffered damages of selective prosecution and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT IX
### (NYS-Malicious Prosecution)

237.   Plaintiff repeat and reallege paragraph 1 through 236 above with the same force and effect as if set forth herein.

238.   By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment, retaliation and having been found by preponderance of the evidence in the Oba Hassan Wat Bey case in violation of "equal protection", "discrimination", denial of due process" demonstrated Malicious Prosecution under New York State law.

239.   As a proximate and/or direct result, Plaintiff suffered damages from malicious prosecution and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest o justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT X
### (NYS-Intentional Infliction of Emotional Distress)

240.    Plaintiff repeat and reallege paragraph 1 through 239 above with the same force and effect as if set forth herein.

241.    By engaging in a policy, custom and practice of targeting Moorish Americans for adverse treatment, Defendant Giuliani knew or should have known that his conduct, as expressed through Defendant Kerik, Caruso and his subordinates Rubin (non-party) vis-a-vis the conduct of OATH through Rubin, with reckless and depraved indifference caused Plaintiff harm that was planned behind a closed door DOC meeting held by Defendant Kerik.

242.    As a proximate and/or direct result, Plaintiff suffered damages of intentional infliction of emotional distress and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT XI
### (NYS-Negligent Infliction of Emotional Distress)

243.    Plaintiff repeat and reallege paragraph 1 through 242 above with the same force and effect as if set forth herein.

244.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment Defendant Giuliani knew or should have known that his conduct, as expressed through Defendant Kerik and his subordinates, to include the subordinates of Defendant Giuliani, vis-a-vis the conduct of OATH through Rubin, with reckless and depraved indifference

intentionally cause the harm that was expressed in the closed door DOC meeting held by Defendant Kerik.

245.    As a proximate and/or direct result, Plaintiff suffered damages of negligent infliction of emotional distress and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

### COUNT XII
### (NYS Constitution - Due Process)

246.    Plaintiff repeat and reallege paragraph 1 through 245 above with the same force and effect as if set forth herein.

247.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment in which Plaintiff was discharge from employment, suffering the lost of a property interest in his employment, violates the "due process" clause the New York State Constitution, Bill of Rights, Article 1, Section 6, 2nd paragraph.

248.    As a proximate and/or direct result, Plaintiff suffered damages and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT XIII
### (NYS Constitution - Equal Protection)

249.    Plaintiff repeat and reallege paragraph 1 through 248 above with the same force and effect as if set forth herein.

250.    By engaging in a pattern, policy, custom and practice of targeting Moorish Americans for adverse treatment, Defendants, and each of them and in corroboration with their subordinates violated Plaintiff rights to "equal protection" as a New York State Citizen under Article 1, Section 11 of the New York State Constitution.

251.    As a proximate and/or direct result, Plaintiff suffered damages and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

## COUNT XIV
### (Employment Discrimination - New York State Human Rights Law)

252.    Plaintiff repeat and reallege paragraph 1 through 251 above with the same force and effect as if set forth herein.

253    Plaintiff is a Moor or Moorish American.

254.    By engaging in a pattern and practice of targeting Moorish Americans for adverse treatment due solely to Plaintiff's association with the Moorish American faith, Defendants violated Plaintiff's right to be free from race and religious discrimination under New York State Human Rights law.

255.   DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

256.   Plaintiff's race and religion was at least a motivating factor in his discharge.

257.   Defendants conduct has caused Plaintiff to suffer damages as more fully stated above.

258.   As a proximate and/or direct result, Plaintiff suffered damages and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

**COUNT XV**
**(Employment Discrimination - New York City Human Rights Law)**

259.   Plaintiff repeat and reallege paragraph 1 through 258 above with the same force and effect as if set forth herein.

260.   Plaintiff is a Moor or Moorish American

261.   By engaging in a pattern and practice of targeting Moorish Americans, and in conspiracy thereof, for adverse treatment due solely to Plaintiff's association with the Moorish American faith, Defendants violated Plaintiff's right to be free from race and religious discrimination under New York City Human Rights law.

262.   DOC employees who did not claim to be Moorish American, some of whom were white, but who also submitted the same or substantially similar documents to the Department were not similarly suspended, placed on modified duty, recommended for, and in fact discharged.

263.    Plaintiff's race and religion were at least a motivating factor in his discharge

264.    Defendants conduct has caused Plaintiff to suffer damages as more fully stated above.

265.    As a proximate and/or direct result, Plaintiff suffered damages and continue to suffer damages to which Plaintiff is entitled to equitable and ancillary relief as a matter of law and in the interest of justice.

WHEREFORE, Plaintiff demands judgment for money damages and declaratory relief against Defendants, and each of them, together with full reinstatement to DOC as a Correction Officer and subsequent full retirement and pension benefits as Captain, and as to such other and further relief as the Court may deem reasonable and just under the circumstances.

### JURY DEMAND

266.    Plaintiff demands a trail by jury on all issues of facts to be decided by the Jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pray that this Court, in the interest of justice, grant judgment containing the following relief:

a.    To set aside the Stipulation of Dismissal in case Jawan Akil Bey, et. al. vs. The City of New York, et. al. 98 Civ. 1353 (LAK)(HBP) on the grounds of new information and evidence, fraud and conspiracy per FRCP 60(d)(1) and (3);

b.    To set aside the judgment order in Shekhem El Bey v. The City of New York, et. al. 99 Civ. 12490 (JES)(MHD) on the grounds of new information and evidence, fraud and conspiracy per FRCP 60(d)(1) and (3);

c.    To set aside the judgment order in Shekhem El Bey v. City of New York, et. al. 00 Civ. 9260 (JES) on grounds of newly discovered information and evidence giving rise to fraud and conspiracy per FRCP 60 (d)(1) and (3); FRCP 60 (d) (3).

d.    To set aside the Judgment order in Shekhem El Bey v. City of New York, et. al. 05 Civ. 7270 (TPG) on the grounds of new information and evidence, fraud and conspiracy per FRCP 60(d)(1) and (3);

e.    An award of Thirteen Million Dollars ($13,000,000.00) as sum certain encompassing but not limited to: punitive and compensatory damages: loss of wages, overtime, benefits and promotional opportunities, including an award of front pay, loss of future salary and benefits, loss of opportunity to obtain any city government job, out of pocket expenses, and for being stigmatized as a "black separatist" terrorist as a Moor, and for mental anguish, loss of enjoyment and quality of life, negligent and intentional infliction of emotional distress, anxiety, loss of sleep, depression, loss of reputation, pain and suffering, humiliation, embarrassment and emotional injury;

f.    Reinstatement with all and/or full benefits to employment with the New York City Department of Correction as a Correction Officer with full restoration of seniority, expunging of adverse comments in Plaintiff's personnel file and then retired as Correction Captain with full pension and benefits immediately thereafter, including "Good Guy Letter",.

g.    In the interest of justice, to Declare this actions as a Class Action by extension to protect Moors or Moorish Americans who are similarly situated or victims of this action stated herein, and for Moorish Americans seeking present or future employment with the City of New York in general.

h.    To Declare the actions of Defendants, and each of them, a violation of Plaintiff's fundamental human rights with respect to Article 15 of the Universal Declaration of Human Rights.

i.    To Declare that OATH and/or its proceedings denies due process and its impartiality compromised by (1) the inappropriate influence of Defendant Giuliani who is or was empowered by executive order and the city charter to direct it and (2) because the City's pecuniary interest in which

it becomes enriched as a revenue source from the imposition of economic penalties, i.e. termination from employment and loss of pension, that are recommended or "rubber stamped" by OATH.

j.     Leave to amend the complaint pursuant to Rule 15 (a) and (b) of the FRCP in the event further and new information or evidence requires new parties to be joined in as Defendants, and as to such other corrections and/or updates needed to perfect the pleadings.

k.     An award of all Court Cost, fees and incurred expenses of this action.

l.     Such other and further relief as the Court may deem reasonable and just under the circumstances.

I, Yashua Amen Shekhem El Bey, the Plaintiff herein declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my first hand knowledge:

DATED:     _2/24/2014_
          New York, New York

Signature: _Yeash Amen Sh El El Bey_

Name: _Yashua Amen Shekhem El Bey_
      244 Fifth Avenue, Suite 200
      New York, New York 10001
      Ph: 347-238-0639

ANIL TANEJA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02TA6130161
Qualified in New York County
My Commission Expires October 06, 2017

STATE OF NEW YORK
COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me this _24_ day of _Feb_, 20_14_, by _Yashua Amen Shekhem El Bey_

_Anil Taneja_   Anil Taneja   Notary Public
My Commission Exp. October 06, 2017

**VERIFICATION**

STATE OF NEW YORK    )
                                          ) as:
COUNTY OF NEW YORK)

BEFORE ME personally appeared: _YASHUA AMEN SHEKHEM EL BEY_____

who, being by me first duly affirmed and identified in accordance with New York State Law,

deposes and says:

My name is Yashua Amen Shekhem El Bey, the Plaintiff herein.

I have read and understand the attached foregoing verified civil complaint, and each fact alleged

therein is true and correct of my own personal first hand knowledge, except as to the matters therein

stated to be alleged on information and belief, and that as to those matters I believes it to be true.

FURTHER THE AFFIANT SAYETH NAUGHT.

_____
Yashua Amen Shekhem El Bey, Plaintiff - Affiant

Affirmed To and subscribed before me this _24_ day of ___February___ 2014.

_____
Notary Public

ANIL TANEJA
NOTARY PUBLIC-STATE OF NEW YORK
No. 02TA6130161
Qualified in New York County
My Commission Expires October 06, 2017

My Commission Expires:_____

§

§

§

§

§

§

§

§

§

§

§

# Exhibit A

```
CCALBEY1                    Trial
```

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    OBA HASSAN WAT BEY, et al.,

4                 Plaintiffs,

5            v.                          99 CV 3873 (AJN)
                                         01 CV 9406 (AJN)
6    THE CITY OF NEW YORK, et al.,

7                 Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        December 10, 2012
                                         9:18 a.m.
10

11   Before:

12                   HON. ALISON J. NATHAN,

13                                       District Judge

                            APPEARANCES
14

15   THOMAS & ASSOCIATES
          Attorneys for Plaintiffs
16   BY:  IRENE DONNA THOMAS
          -and-
17        DAVID SCHLACHTER

18   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
19        Attorneys for Defendants
     BY:  MAXWELL D. LEIGHTON
20        RICARDO TAPIA
          JAMES M. LEMONEDES
21

22

23

24

25

CCALBEY3                         Blake - recross

1   exemptions they claim.   Respondents' beliefs, as sincere as

2   they may be, do not present colorable legal claims."

3           MR. TAPIA:   Thank you.   I have no further questions.

4           THE COURT:   All right.   Ms. Blake, you may step down.

5   Thank you.

6           (Witness excused)

7           THE COURT:   Who's the next witness, please?

8           MS. THOMAS:   Terrence Skinner.

9           THE COURT:   Please bring in Mr. Skinner.

10          Is someone getting Mr. Skinner?

11          MS. THOMAS:   Yes.

12          THE COURT:   Good afternoon, Mr. Skinner.   Come on up,

13  please.

14   TERRENCE SKINNER,

15       called as a witness by the Plaintiffs,

16       having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MS. THOMAS:

19  Q.  Good morning, Mr. Skinner.

20          Are you currently employed?

21  A.  No, I'm not.

22  Q.  Between 1997 and 1998, where were you employed?

23  A.  The New York City Department of Correction.

24  Q.  And how long had you -- were you employed by the New York

25  City Department of Correction?

CCALBEY3                    Skinner - direct

1    A.  At that time, 14 years.

2    Q.  And what was your job title at that time during that

3    period?

4    A.  I was a deputy warden, the executive officer to the chief

5    of security.

6    Q.  And who was your immediate superior?

7    A.  Chief William Fraser.

8    Q.  And what was his job title, he was chief of the department?

9    A.  He was chief of security.

10   Q.  Now, who was Commissioner of the New York City Department

11   of Corrections at that time?

12   A.  Bernard Kerik.

13   Q.  And the mayor?

14   A.  Rudolph Giuliani.

15   Q.  Now, what were your job duties as executive officer to the

16   chief of security?

17   A.  Responsibilities included managing overall security

18   throughout the entire department.

19   Q.  And did you have any responsibilities in connection with

20   the gang intelligence unit?

21   A.  Yes.  The chief of security's office oversaw the gang

22   intelligence unit.

23   Q.  And did you have particular responsibilities in connection

24   with that unit?

25   A.  I had previously been the commanding officer of the gang

CCALBEY3                        Skinner - direct

1    intelligence unit.

2    Q.  Who was responsible for establishing the unit?

3    A.  It was Chief Taylor.  Initially, the unit was the gang task

4    force.  I was asked to conduct an analysis of how it operated

5    and what it did.  I did that, and then I was placed in charge

6    of the new gang intelligence unit.

7    Q.  Now, was the gang intelligent unit ever used for a purpose

8    other than its original intent?

9    A.  One time, at some point in 1998 between August and December

10   of 1998.

11   Q.  And what happened at that time?

12   A.  We were instructed by the Inspector General, Mike Caruso,

13   to have the gang intelligence unit conduct video surveillance

14   of a protest at 60 Hudson Street.

15   Q.  And was there a meeting held to plan the surveillance?

16   A.  Initially there was a meeting between myself, Chief Fraser,

17   Commissioner Kerik, and his chief of staff, John Piciano.  And

18   at that meeting we were instructed that Mike Caruso would

19   contact us and that we should do what he needed us to do

20   regarding our surveillance of the demonstration that was going

21   to take place.

22   Q.  And what was the concern that was raised at that meeting

23   concerning the surveillance activity?

24   A.  The commissioner indicated that the mayor had held a press

25   conference and indicated that these people were going to be

CCALBEY3                    Skinner - direct

1  fired for the actions that they had taken and that this was an

2  important issue, so we should do what was necessary to assist

3  the Inspector General's Office in trying to gather information

4  against this group.

5  Q.  And what group were you referring to, sir?

6  A.  They were referred to as the Moors.

7  Q.  Now, did you actually conduct surveillance at the 60 Hudson

8  Street location?

9  A.  The gang intelligence unit did do video surveillance of the

10  demonstration, yes.

11  Q.  Were you present during that surveillance?

12  A.  I wasn't with them, but I was present at 60 Hudson Street,

13  out on the street, observing the protest.

14  Q.  At any time did the gang intelligence unit remove

15  individuals from the 60 Hudson Street location?

16  A.  No.  It was the security for the actual demonstration was

17  done by the NYPD.  The gang intelligence unit was in an

18  undercover vehicle and they did the surveillance.  And it was

19  peaceful, there were no issues, and basically that was the end

20  of the surveillance.

21           MS. THOMAS:  Thank you very much.  No further

22  questions save any redirect.

23           THE COURT:  Anything, Mr. Schlachter?

24           MR. SCHLACHTER:  No questions, your Honor.

25           THE COURT:  Who will be examining?

Skinner - direct

CCALBEY3

1        MR. TAPIA:  Yes, your Honor, I have a few questions.

2        THE COURT:  Mr. Tapia.

3   CROSS-EXAMINATION

4   BY MR. TAPIA:

5   Q.  Good morning, Mr. Skinner.

6   A.  Good morning.

7   Q.  Did you have a lawsuit where you sued the City of New York

8   and the Department of Corrections previously?

9   A.  Yes, I did.

10  Q.  And that lawsuit was resolved?

11  A.  Yes, it was.

12  Q.  Now, have you spoken to Ms. Thomas, Irene Donna Thomas, in

13  the past?

14  A.  Yes, I have.

15  Q.  Have you ever spoken to me in the past?

16  A.  Not that I know of.

17  Q.  And what about Mr. Maxwell Leighton, have you spoken to

18  him?

19  A.  He looks familiar but I don't think so.

20  Q.  As far as any of the tax records that were submitted by the

21  plaintiffs in this case, have you seen any of those documents?

22  A.  I have not.

23  Q.  Have you read any of the decisions issued by the

24  administrative law judge in these cases?

25  A.  No, I have not.

CCALBEY3                     Skinner - cross

1  Q.  And as far as the demonstrations that were held that day,

2  were they stopped at all in any way?

3  A.  No.  It was just one demonstration.

4          MR. TAPIA:  I have nothing further.  Thank you.

5          THE COURT:  Ms. Thomas.

6  REDIRECT EXAMINATION

7  BY MS. THOMAS:

8  Q.  Mr. Skinner, without going into the specifics of your

9  lawsuit, what was its resolution?

10 A.  The case was decided in my favor.

11         MR. TAPIA:  Objection, your Honor.

12         THE COURT:  Overruled.  Go ahead.

13 A.  The case was decided in my favor, a jury trial.

14 Q.  And were you satisfied with that?

15 A.  Yes, I was.

16         MS. THOMAS:  No further questions, your Honor.

17 RECROSS EXAMINATION

18 BY MR. TAPIA:

19 Q.  Now, did your case have anything to do with the Moorish

20 American faith?

21 A.  No, it did not.

22 Q.  Did it have anything to do with these seven individuals in

23 this courtroom?

24 A.  No, it did not.

25 Q.  By the seven individuals, obviously, I mean the plaintiffs.

CCALBEY3                    Skinner - recross

1    A.  No.

2    Q.  Okay.  And as far as the verdict in your favor, you

3    actually settled the case after the verdict, correct?

4    A.  The city appealed and then there was a settlement, yes.

5              MR. TAPIA:  Thank you so much.

6              THE COURT:  You may step down.  Thank you.

7              THE WITNESS:  Leave?

8              THE COURT:  Yes, you may.

9              (Witness excused)

10             THE COURT:  Ms. Thomas, who will be the next witness?

11             MS. THOMAS:  Mr. Andrew Fenneck.  Is he here?

12             MR. LEIGHTON:  Give me 30 seconds.  I have to see

13   which witness is present.

14             THE COURT:  I invite you to stand in place and stretch

15   if you like.

16             MR. LEIGHTON:  Your Honor, I believe both witnesses or

17   the next witness is on the 8th floor.  We moved a little more

18   quickly than I expected.  They are present; I know they're

19   there.  It's your discretion if you wish for me to get them and

20   bring them up.

21             THE COURT:  I do.  I'll let the jury take a break

22   rather than sitting here.  You can go back to the room for

23   about five minutes.

24             (Continued on next page)

25



§

§

§

§

§

§

§

§

§

§

§

# Exhibit B

Case 1:99-cv-03873-AJN-RLE    Document 531    Filed 11/05/13    Page 1 of 2

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _11/5/13_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
OBA HASSAN WAT BEY, et al.,

        Plaintiffs,

   -against-

THE CITY OF NEW YORK, et al.,

        Defendants.
------------------------------------------------------------X

99 **CIVIL** 3873 (AJN)
01 **CIVIL** 9406 (AJN)
**AMENDED JUDGMENT**

#12,2265

  Following a trial held from December 4 through December 13, 2012, a jury having rendered

a verdict finding in favor of Plaintiffs and against Defendants City of New York ("the City"),

William Fraser ("Fraser"), and Bernard Kerik ("Kerik") (collectively, "Defendants"); thereafter,

post-trial motions were filed by the parties in the above-captioned employment discrimination

action; on September 4, 2013, this Court having rendered a Memorandum and Order granting

Defendants' motion to vacate the award of punitive damages, but denying the remainder of

Defendants' motion, granting Plaintiffs' motions for pre-and post-judgment interest, but denying

the remainder of Plaintiffs' Rule 59 and 60 motions, granting Plaintiffs' motions for attorney's fees

and costs in part, awarding Ms. Thomas $1,271,573.96 in fees and costs, awarding Mr. Schlachter

$175,253.50 in fees and costs, and directing the Clerk of the Court to correct the judgment

previously entered, Dkt. No. 396, to reflect this Order, and the matter having come before the

Honorable Alison J. Nathan, United States District Judge, and the Court, on October 22, 2013,

having rendered its Order granting Plaintiffs' request for calculation of prejudgment interest, and

directing the Clerk of the Court to calculate prejudgment interest according to the methodology

described in Section IV.B of the Court's Memorandum and Order dated September 4, 2013, see Dkt.

No. 501, at 60-61, and using the dates given in Plaintiffs' letter dated October 22, 2013, Dkt. No.

529, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum and Order dated September 4, 2013 and Order dated October 22, 2013,

Defendants' motion to vacate the award of punitive damages is granted, but the remainder of

Defendants' motion is denied; judgment is entered as follows: in favor of plaintiff Robert Watson

in the amount of $488,000 plus pre-judgment interest of $106,071.41 for a total of $675,404.75; in

favor of plaintiff Pedro Rivera Sr. Bey in the amount of $467,000 plus pre-judgment interest of

$87,005.89 for a total of $554,005.89; in favor of plaintiff Alberto Rivera Bey in the amount of

$405,000 plus pre-judgment interest of $40,994.00 for a total of $445,994.00; in favor of plaintiff

Hassan Abdallah in the amount of $467,000 plus pre-judgment interest of $87,005.89 for a total of

$554,005.89; in favor of plaintiff Edward Ebanks in the amount of $300,000 plus pre-judgment

interest of $55,892.44 for a total of $355,892.44; in favor of plaintiff Michael Nichols in the amount

of $379,000 plus pre-judgment interest of $70,610.77 for a total of $449,610.77; in favor of plaintiff

Herbert Hinnant in the amount of $300,000 plus pre-judgment interest of $55,892.44 for a total of

$355,892.44; all as against defendant City of New York; Plaintiffs' motions for pre-and

post-judgment interest are granted, but the remainder of Plaintiffs' Rule 59 and 60 motions are

denied; Finally, Plaintiffs' motions for attorney's fees and costs are granted in part; Ms. Thomas is

awarded $1,271,573.96 in fees and costs, and Mr. Schlachter is awarded $175,253.50 in fees and

costs.

**DATED:** New York, New York
           November 5, 2013

                                    **RUBY J. KRAJICK**
                                    _____
                                    **Clerk of Court**

                         **BY:**    _____
                                    **Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

§

§

§

§

§

§

§

§

§

§

§

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

YASHUA AMEN SHEKHEM'EL-BEY,

                 Plaintiff,

      - against -

CITY OF NEW YORK, ET AL.,

                Defendants.

------------------------------------------------x

05 Civ. 7270 (TPG)

**ORDER**

U.S. DISTRICT COURT
FILED
APR 2 0 2006
S.D. OF N.Y.

      Pursuant to plaintiff's request in letters dated November 21, 2005 and April 13, 2006, this case is dismissed without prejudice.

SO ORDERED.

Dated:     New York, New York
            April 19, 2006

                           THOMAS P. GRIESA
                           U.S.D.J

MICROFILM
APR 2 1 2006  9:00 AM